# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND NORTHERN DIVISION

|  |  |  |
|---|---|---|
| RODNEY COSTER<br>c/o Mayer Brown LLP<br>1999 K Street, N.W.<br>Washington, DC 20006 | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. <u>21-cv-65</u> |
| v. | ) ) | |
| THE STATE OF MARYLAND,<br>HARFORD COUNTY, MD, THE<br>HARFORD COUNTY SHERIFF'S<br>OFFICE, HARFORD COUNTY<br>DETENTION CENTER, HARFORD<br>SHERIFF JEFFREY GAHLER,<br>WARDEN MICHAEL CAPASSO,<br>DFC DONALD LICATO, DFC<br>CHRISTOPHER MAJEWSKI, DFC<br>MARK JERIC, DFC BLISS, DFC<br>NORTON, DFC ROBINSON, DFC<br>D. SEMAN, DFC STAVROS<br>KALAMBIHIS, SGT. ANDREW<br>MEADOR, CPL. GOINS,<br>DFC JOE DIBARTOLO,  AND<br>DOES 1 TO 20 | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff Rodney Coster ("Mr. Coster"), for his Complaint against Defendants the State of

Maryland, Harford County, MD, the Harford County Sheriff's Office ("Sheriff's Office"), the

Harford County Detention Center, Harford Sheriff Jeffrey Gahler, Warden Michael Capasso,

Harford County Sheriff's Officers Sgt. Andrew Meador, Cpl. Nicholas Goins, and Harford County

Sheriff's Deputies Donald Licato, Christopher Majewski, Matthew Norton, Bliss, Mark Jeric, Robinson, D. Seman, Stavros Kalambihis, and Joe DiBartolo (collectively, the "Individual Defendants," all of whom Mr. Coster sues in both their official and personal capacities), and Does 1 to 20, by and through counsel, alleges as follows:

# I  INTRODUCTION

1.      On January 10, 2018, Mr. Coster went to visit his mother, Sharon Coster ("Ms. Coster") for her birthday.  Ms. Coster immediately realized that Mr. Coster—who had been diagnosed with Bipolar I Disorder decades ago—was having a mental health crisis and was not making sense.  Recognizing that her son needed professional mental and psychological care, she persuaded him to drive her to the Harford County Sheriff's Office located at the Harford County Detention Center, so that she could help him to get help.

2.      When Ms. Coster and Mr. Coster arrived at the Harford County Detention Center, they parked in the driveway in front of the building and sat in the car until two Sheriff's Office deputies, Deputy First Class ("DFC") Licato and DFC Majewski, pulled up in their cruiser.  Ms. Coster then got out of the car and spoke with DFC Licato, while Mr. Coster sat in the car.  She explained that Mr. Coster was bipolar and was not taking his medicine, and that she wanted the Sheriff's Office deputies to assist him in getting help.  She asked the deputies not to hurt Mr. Coster.

3.      In response, the Sheriff's deputies chose to treat Mr. Coster as a criminal suspect, rather than direct Ms. Coster and Mr. Coster to a medical or psychiatric facility, or call professional mental health care providers, or utilize the Sheriff's Office Crisis Intervention Team—a team of individuals specifically trained to work with citizens experiencing mental health crises in order to deescalate those situations and prevent criminal justice involvement.

4.     The deputies went over to the car where Mr. Coster had been waiting and demanded his license (which he provided) and began to question him.  When he responded in the manner of a person in the midst of an acute mental health crisis by saying that no one could help him and repeating over and over, largely to himself, that **"everything's going to be OK,"** the deputies reacted in a way that they never would have, but for Mr. Coster's mental health issues. They tried to pull Mr. Coster out of the car, and then, when Mr. Coster passively resisted for about four seconds, DFC Majewski pulled out his Taser, aimed it at Mr. Coster, and repeatedly tased him.

5.     The deputies then pulled Mr. Coster from the vehicle, hit him with (in DFC's Majewski's words) **"fist and knee strikes"** while he was on the ground, and on information and belief, continued to tase him.  As the deputies continued to manhandle Mr. Coster, they caused his pants to fall down—exposing him in front of his mother, who helplessly watched in horror as her son was assaulted by the deputies.

6.     Within the next twenty seconds, a total of seven Sheriff's Office employees piled on top of Mr. Coster.  DFC Majewski continued to punch Mr. Coster while kneeling on his head and neck, while other deputies in the dogpile continued striking and leaning into Mr. Coster. Throughout it all, Mr. Coster never fought back.

7.     After Mr. Coster's hands were cuffed behind his back, Sheriff's deputies lifted him off the ground his wrists, causing excruciating pain to Mr. Coster's shoulders.  The deputies were so aggressive in lifting Mr. Coster off the ground by his wrists that Mr. Coster actually flipped over, and the deputies carried him into the Harford Detention Center upside down.  Mr. Coster's shoulder was dislocated by the deputies' actions.

8.     The Sheriff's Office waited until the next day to take Mr. Coster to the hospital to have his injuries treated—treatment that the Sheriff's Office should have provided immediately, but, due to Mr. Coster's mental health disability, did not.

9.     At the hospital, when the pain of having his shoulder reset caused Mr. Coster to struggle—although it did not cause him to behave violently toward anyone—one of the three Sheriff's deputies accompanying Mr. Coster began striking Mr. Coster in the face, while the other two deputies restrained Mr. Coster.  Mr. Coster did not fight back; indeed, during the entire beating he was shackled to the hospital bed by his legs and one of his arms (the arm that did not have a dislocated shoulder).  By the end of the beating, Mr. Coster's face and chest were so bloody that his clothes had to be cut off and thrown away.

10.     Ms. Coster turned to the Sheriff's Office when she and her son needed help the most; she never imagined that he would be subjected to violence.  But instead of accommodating Mr. Coster's mental health disability by directing him to appropriately trained mental healthcare providers, or otherwise deescalating the situation, the Sheriff's Office employees chose to criminalize Mr. Coster's mental illness.  Twice, they savagely and needlessly beat Mr. Coster.  Their actions reflect bias against persons with mental health disabilities—persons who are, in fact, far more likely to be *victims* than perpetrators of violence.  That is exactly what happened here; that is exactly what necessitates this suit.

## II     JURISDICTION AND VENUE

11.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit asserts federal claims pursuant to the Americans with Disabilities Act, the Rehabilitation Act of 1973, and 42 U.S.C. § 1983.

12.     This court has jurisdiction over Mr. Coster's related claims asserted under Maryland law, which arise from the same nucleus of operative fact as the federal claims, pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, all defendants reside in the State of Maryland and Defendants Harford County, MD, Harford County Sheriff's Office, and Harford County Detention Center reside in this district.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Mr. Coster's claims occurred in this district.

14.     Plaintiff has provided timely notice of the facts and circumstances giving rise to the claims against the State of Maryland herein and has received a final denial from the Treasurer of the State of Maryland, satisfying its obligations pursuant to Md. Code, State Gov't § 12-106.

## III     THE PARTIES

15.     Defendant State of Maryland is the State where the events alleged herein occurred. Employees of the Harford County Sheriff's Office, including the Individual Defendants, are constitutional officers of the State of Maryland.  The State of Maryland is liable for the conduct of employees of the Harford County Sheriff's Office in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12010 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a).

16.     Defendant Harford County is the County in the State of Maryland where the events described herein occurred.  Harford County is liable for the violations of Mr. Coster's rights under the Fourteenth Amendment in connection with the conditions of Mr. Coster's confinement at the Harford County Detention Center.

739480580.8 8-JAN-21 23:37

17.     Defendant Harford County Sheriff's Office is the second largest Sheriff's office in Maryland and the primary law enforcement office responsible for servicing the population of Defendant Harford County.

18.     Defendant Harford County Detention Center is a detention center at 1030 Rock Spring Road, Bel Air, MD, which is located in Harford County, and where Mr. Coster was incarcerated after the January 10, 2018 incident in which the Individual Defendants violated Mr. Coster's rights as set forth herein.  On information and belief, the Harford County Detention Center is a division of Defendant Harford Sheriff's Office.

19.     Defendant Jeffrey Gahler is the Harford County Sheriff.  He is responsible for the conduct of the employees of the Harford County Sheriff's Office and the policies and procedures of the Harford County Sheriff's Office.  He is named as a defendant in his official and personal capacity.

20.     Defendant Michael Capasso is the Warden of the Harford County Detention Center and an employee of the Harford County Sheriff's Office.  Warden Capasso is responsible for the conditions of confinement at the Harford County Detention Center and on information and belief is responsible for the policies and procedures governing the Harford County Detention Center. Warden Michael Capasso participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018. He is named as a defendant in his official and personal capacity.

21.     Defendant Christopher Majewski is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  His Harford County Sheriff's Office badge number is #953. DFC Majewski participated in the excessive use of force on Mr. Coster, and other violations of

739480580.8 8-JAN-21 23:37

Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his official and personal capacity.

22.     Defendant Donald Licato is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  His Harford County Sheriff's Office badge number is #889.  DFC Licato participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his official and personal capacity.

23.     Defendant Matthew Norton is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  Defendant Norton's Harford County Sheriff's Office badge number is #998.  DFC Norton participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his official and personal capacity.

24.     Defendant Bliss is employed by the Harford County Sheriff's Office.  Defendant Bliss participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his official and personal capacity.

25.     Defendant Mark Jeric is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  Defendant Jeric's Harford County Sheriff's Office badge number is #524.  On information and belief, DFC Jeric participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his official and personal capacity.

26.     Defendant D. Seman is employed by the Harford County Sheriff's Office.  Defendant Seman's Harford County Sheriff's Office badge number is #881.  On information and

belief, Defendant Seman participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018. Defendant Seman is named as a defendant in both his official and personal capacity.

27.    Defendant Stavros Kalambihis is employed by the Harford County Sheriff's Office. Defendant Kalambihis's Harford County Sheriff's Office badge number is #918.  On information and belief, Defendant Kalambihis participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018. Defendant Kalambihis is named as a defendant in both his official and personal capacity.

28.    Defendant Andrew Meador is employed by the Harford County Sheriff's Office as a Sergeant.  Defendant Meador's Harford County Sheriff's Office badge number is #904.  Sgt. Meador participated in the January 11, 2018 assault on Mr. Coster at the Upper Chesapeake Medical Center.  Defendant Meador is named as a defendant in both an official and personal capacity.

29.    Defendant Goins is employed by the Harford County Sheriff's Department as a Corporal.  Defendant Goins' Harford County Sheriff's Office badge number is #825.  Cpl. Goins participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, at the Upper Chesapeake Medical Center on January 11, 2018.  Defendant Goins is named as a defendant in both his official and personal capacity.

30.    Defendant Joe DiBartolo is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  DFC DiBartolo's Harford County Sheriff's Office badge number is #933. DFC DiBartolo participated in the excessive use of force on Mr. Coster, and other violations of Mr. Coster's rights, at the Upper Chesapeake Medical Center on January 11, 2018.  Defendant DiBartolo is named as a defendant in both his official and personal capacity.

31.     Does 1 to 20 include other individuals captured on video who participated in the January 10, 2018 assault on Mr. Coster outside of the Harford County Detention Center.  On information and belief, these may include employees of the Harford County Sheriff's Office with badge numbers 841, 523, 923, 899, 501, 604, and 751.  All appear to be white males.  Does 1 to 20 also include other employees of the Harford Sheriff's Office who assisted with the incarceration of Mr. Coster, had actual knowledge of the conditions of his confinement, and were deliberately indifferent to his need for exigent medical care.  The John Doe defendants are named as defendants in their official and personal capacities.

32.     Plaintiff Rodney Coster is a resident of Baltimore County, Maryland.  He suffers from a diagnosed mental health disability, Bipolar I Disorder.  As a person diagnosed with Bipolar I Disorder, Mr. Coster is a qualified person with a disability for purposes of the ADA.

## IV     THE DANGER POLICE ENCOUNTERS POSE TO PEOPLE WITH MENTAL HEALTH DISABILITIES

33.     Law enforcement officers are often ill-trained and ill-equipped to appropriately handle and deescalate encounters with citizens suffering from mental health disabilities, too often leading to tragic, and avoidable, consequences.

34.     Data indicate that individuals with disabilities have more interactions with police than individuals without disabilities, and at least 25 percent of all police killings are people in a mental health crisis.[1]

35.     Indeed, according to a *Washington Post* article tracking fatal police shootings (which are just one type of lethal force used by police), approximately 20% of those shot and killed

---

[1] Mizner, Susan, "*Police 'Command and Control' Culture Is Often Lethal — Especially for People With Disabilities*," ACLU (May 10, 2018), https://www.aclu.org/blog/criminal-law-reform/reforming-police/police-command-and-control-culture-often-lethal-especially.

suffered from mental illness.[2]  And a White Paper authored by David Perry and disability expert Lawrence Carter-Long noted that "[d]isabled individuals," including those with mental illness, "make up a third to half of all people killed by law enforcement."[3]

36.     Harmful stereotypes and social stigma concerning people with mental health disabilities contribute to their mistreatment.  Such disabilities are often—incorrectly—conflated with dangerousness,[4] and the media exacerbates and strengthens these stereotypes by sensationalizing violent crimes committed by individuals who are perceived as having mental health disabilities.[5]  Commentators have long noted that such harmful stereotypes have informed efforts to coerce individuals with mental health disabilities and jeopardize their fundamental human rights to bodily autonomy.[6]

37.     Any link between mental health disabilities and dangerousness has been strongly repudiated.  The medical community has provided consistent conclusions for years:  people with mental health disabilities are much more likely to be the *victims* of violent crime than they are to

---

[2] *Fatal Force 999 People were Shot and Killed by Police in 2019*, Washington Post (Aug. 10, 2020), https://www.washingtonpost.com/graphics/2019/national/police-shootings-2019/.

[3] David M. Perry & Lawrence Carter-Long, *Media Coverage of Law Enforcement Use of Force and Disability*, Ruderman Family Foundation (Mar. 2016), https://rudermanfoundation.org/white_papers/media-coverage-of-law-enforcement-use-of-force-and-disability/.

[4] Mohit Varshney et al., *Violence and mental illness: what is the true story?*, 70 J. Epidemiol Community Health 223-225 (2016), https://jech.bmj.com/content/jech/70/3/223.full.pdf.

[5] Aaron Levin, *Media Cling to Stigmatizing Portrayals of Mental Illness*, Psychiatric News (Dec. 16, 2011), https://psychnews.psychiatryonline.org/doi/full/10.1176/pn.46.24.psychnews_46_24_16-a.

[6] *E.g.*, Bernice A. Pescosolido et al., *The Public's View of the Competence, Dangerousness, and Need for Legal Coercion of Persons with Mental Health Problems*, 89 Am. J. Pub. Health 1339-1345 (Sept. 1999), https://ajph.aphapublications.org/doi/pdfplus/10.2105/AJPH.89.9.1339; Dainius Puras & Piers Gooding, *Mental Health and Human Rights in the 21st Century*, World Psychiatry 18:1 (Jan. 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6313250/pdf/WPS-18-42.pdf.

be perpetrators, and the vast majority of people with mental health disabilities are no more likely to be violent than any other person.[7]

## V   **RODNEY COSTER**

38.     Mr. Coster was born in in Baltimore, Maryland, in 1966.  He currently resides in Baltimore County, MD.

39.     Mr. Coster is a 54 year-old white male.  At 5'3" tall and weighing 145 pounds, he is small in stature.

40.     Mr. Coster earned his high school diploma in 1985, and for three years prior to the events set forth herein, he was employed to oversee and maintain a small chain of six convenience stores.  Mr. Coster's employer reports that Mr. Coster has "never missed work or been late," and "never had an issue at work."

41.     Mr. Coster has been married for over 20 years.  He is currently separated from his wife, with whom he remains very close friends.

42.     Mr. Coster was first diagnosed with Bipolar I disorder when he was in his twenties. When he takes the prescribed medications needed to treat his Bipolar I Disorder, the medications result in him being largely asymptomatic. However, one of the common symptoms of Bipolar I Disorder is that patients sometimes fail to follow their prescribed medication regimen.  Mr. Coster, for example, has ceased taking his medication from time to time, leading to the occurrence of symptoms, although in each instance in which this has occurred, and he required mental health

---

[7] U.S. Dep't of Health and Human Servs., *Mental Health Myths and Facts* (Aug. 29, 2017), https://www.mentalhealth.gov/basics/mental-health-myths-facts; American Psychiatric Association, *APA Condemns Loss of Life from Gun Violence, Disputes Link to Mental Illness* (Aug. 5, 2019), https://www.psychiatry.org/newsroom/news-releases/apa-condemns-loss-of-life-from-gun-violence-disputes-link-to-mental-illness.

interventions, Mr. Coster has been hospitalized or otherwise received mental health care, resumed his treatment, and his symptoms have abated.

## VI   DEFENDANTS' MISCONDUCT ON JANUARY 10, 2018.

43.     On the morning of January 10, 2018, Mr. Coster was visiting his mother, Sharon Coster, for her birthday.

44.     At the time of this visit, Mr. Coster was suffering from delusions, and it was readily apparent to Ms. Coster that he had been off of his medication for some time.

45.     Accordingly, Ms. Coster convinced Mr. Coster to drive them both in her car to the Harford County Detention Center.  Her objective was to get Mr. Coster the help he needed.  In similar, prior situations, law enforcement professionals have assisted Ms. Coster in obtaining medical and psychiatric help for Mr. Coster's mental health disability, resulting in his receiving mental health treatment without incident.

46.     Upon arriving at the Detention Center at or around 8:00 AM, Mr. Coster and Ms. Coster parked in the driveway in front of the building, near a section of the lawn with a flagpole.

47.     Moments later, DFC Licato parked his Sheriff's Office cruiser in front of Ms. Coster's car.  DFC Licato then exited his cruiser and approached Ms. Coster's car.

48.     Ms. Coster exited her car and began a conversation with DFC Licato in the driveway in front of the Detention Center.  Ms. Coster explained to DFC Licato that her son was bipolar and off of his medication, and said that she thought he should be seen by medical professionals and wanted the Sheriff's Office to assist with connecting him with trained mental health professionals.  She said nothing to indicate that Mr. Coster was in any way threatening to himself or others.  She explicitly asked DFC Licato not to hurt Mr. Coster.

49.     DFC Licato immediately approached the driver's side of Ms. Coster's car, where Mr. Coster was sitting with the door closed.  DFC Licato asked Mr. Coster for identification.  Mr.

Coster complied, willingly handing his driver's license to DFC Licato through the open car window.  In response to questioning from DFC Licato, Mr. Coster told DFC Licato that the car belonged to his mother.

50.     At or around this time, DFC Licato was joined by DFC Majewski. In response to further questions, Mr. Coster said that no one could help him, and he began to repeat that "everything's going to be okay" and/or "everything's OK."

51.     Mr. Coster was not doing anything illegal and had not committed any crime. Despite these facts, DFC Licato reached into the car and unlocked the door from the inside.

**A.      First Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations: Unjustified initial Taser discharges**

52.     After unlocking the car door, DFC Licato and DFC Majewski reached into the car and attempted to pull Mr. Coster out of the vehicle.  Video of the incident does not show Mr. Coster punching, kicking or otherwise attacking the officers.   Instead, Mr. Coster resisted passively.

53.     The Taser company itself advised in 2013 that law enforcement should avoid shocking someone "who is actually or perceived to be mentally ill."  Nevertheless, approximately three to four seconds after DFC Licato and DFC Majewski first tried to pull Mr. Coster from the car, DFC Majewski drew and discharged his Taser.  DFC Majewski, DFC Licato and Mr. Coster all agree that DFC Majewski tased—or at least first began to tase—Mr. Coster while Mr. Coster was in the car.

54.     When DFC Majewski first fired his Taser, he did so in "probe mode," meaning that barbed metal darts with wires trailing behind them were shot from the Taser and into Mr. Coster, puncturing his skin and embedding into his flesh.  After the Taser barbs impaled Mr. Coster, DFC

13

Majewski delivered four Taser cycles (lasting 5 seconds, 2 seconds, 3 seconds and 5 seconds) over the following 20 seconds.

55.     Three seconds later, DFC Majewski hit Mr. Coster with a Taser "stun drive." During the "stun drive," DFC Majewski applied the Taser directly to Mr. Coster's leg, point blank, for 3 seconds, completing a circuit of electricity through Mr. Coster's body.  On information and belief, as discussed further below, the "stun drive" occurred when Mr. Coster was out of the car and lying prostrate on the driveway next to his mother's vehicle.  The only reason that DFC Majewski stopped using the Taser was that the taser wires inadvertently began to shock DFC Licato.

56.     As explained in the Police Exec Research Forum & Cmty. Oriented Policing Servs., 2011 Electronic Control Weapon Guidelines 14 (2001), "[d]rive-stunning an individual causes great pain and carries a heightened risk of serious harm or injury when used on individuals with mental health disabilities or in crisis."  As the Fourth Circuit has explained, "[i]n drive-stun mode the taser functions to deliver a painful electric shock," as opposed to the use of probe mode, which delivers a cycle of electricity designed to cause electro-muscular disruption freeing the muscles and disabling the individual.  "In stun mode, the taser does not cause muscular disruption or incapacitation, but rather functions only as a pain compliance tool."  *Meyers v. Balt. Cty*, 713 F.3d 723, 728 n.3 (4th Cir. 2013) (internal quotations omitted).

57.     The Sheriff's Office has a policy for the use of Tasers (referred to as "Conducted Electrical Weapons" or "CEW").   The CEW Policy provides in relevant part that "[w]hen reasonable, unless it would otherwise endanger the safety of the deputy or others, every deputy should loudly announce that the CEW is going to be deployed. The purpose of the warning is to: a. provide the individual with a reasonable opportunity to voluntarily comply; and b. provide other

deputies and other individuals with a warning that the CEW may be deployed." DFC Majewski did not provide this warning, or at a minimum, did not provide this warning with sufficient time to allow Mr. Coster to voluntarily comply. Nor was the warning sufficient to provide other deputies an opportunity to react, because DFC Licato also had insufficient time to step back and avoid being shocked by the Taser wires. In fact, it was the shocks that were affecting DFC Licato that caused DFC Majewski to stop utilizing the Taser.

58.     Even before interacting with Mr. Coster, the Harford Sheriff's deputies questioned his mother, and learned that Mr. Coster was Bipolar and that his mother was requesting assistance to obtain medical help for Mr. Coster, understood that he had come to the Harford County Sheriff's Office voluntarily, with his mother, no less, and were able to observe that he was sitting peacefully in the car. There was no exigency; Mr. Coster remained seated in his mother's car when DFC Majewski interviewed Ms. Coster. Mr. Coster was not exiting the car or creating any disturbances. Mr. Coster did not have a weapon and no weapon was found at the scene. Ms. Coster recalls that officers never searched the car for a weapon, and permitted her to drive the car home, indicating that the officers understood that Mr. Coster did not have a weapon. There was ample time for the deputies to accommodate Mr. Coster's disability, treating his mental health crisis as a medical problem, not a criminal concern by, for example, referring Ms. Coster and Mr. Coster to a hospital or calling in qualified mental health practitioners. If that occurred, it is highly unlikely that the unfortunate events described in this Complaint would have followed.

59.     And if for some reason, the Deputies were going to insist upon treating the situation as a police matter, they had another option: The Harford County Sheriff's Office has a Crisis Intervention Team ("CIT") policy, HCSO Policy No. MAN6100, adopted October 15, 2013.

60.     According to the Policy, the CIT is "[a] team consisting of deputy sheriffs, correctional officers, and civilians who have received specialized training (Crisis Intervention Response Training)." Crisis Intervention Response Training, in turn, is defined as "[a] specialized course of instruction which provides training to law enforcement and correctional officers on responding to mental health crisis-related calls for service in the community and in the detention center. The Mental Health First Aid program serves as the foundation course for the CIT training."

61.     The CIT Policy explicitly states that CIT intervention should be considered unless an arrest is mandated.  It provides in relevant part:

> The primary goal of the CIT program is to have law enforcement, correctional, and civilian employees with specialized training available to assist individuals in mental health crisis. The primary method of accomplishing this goal is to identify the needs of the individual in crisis and make appropriate referrals to that individual. If it appears to be in the best interest of the community and the individual in crisis, ***CIT intervention should be considered as an alternative to arresting the individual*** (assuming law or policy does not mandate an arrest). Adhering to these procedures should further the Agency's goal of reducing the number of mentally ill individuals entering the criminal justice system.

62.     In the event that Harford County Sheriff's deputies were unable to accommodate Mr. Coster's mental illness by referring him away from law enforcement, and toward appropriate mental health practitioners, then at a minimum, they should have reasonably accommodated Mr. Coster by using the CIT team.  Mr. Coster is the poster child for why the policy was developed— a person with a diagnosed mental health disability, in the midst of an acute mental health crisis, who voluntarily and peacefully came to the Sheriff's Office with his mother.

63.     Sheriff's Office employees, however, inexplicably failed to utilize their CIT to interact with Mr. Coster.  (In the alternative, if DFC Licato or DFC Majewski received CIT training prior to the incident, that training was inadequate and DFC Licato and DFC Majewski failed to appropriately utilize whatever training they received.)

64.     Moreover, once the Harford County Sheriff's deputies began to interact with Mr. Coster, they again failed to take steps to reasonably accommodate his mental health disability. When Mr. Coster said that no one could help him and began repeating, largely to himself, that "everything's going to be OK," Sheriff's deputies should have made appropriate accommodations, e.g., ensured that personnel qualified to communicate with an individual in the midst of a mental health crisis were available to do so, slowing the pace of the interaction, referring the matter to medical providers—but they did not.

**B.     Second Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Unjustified Taser discharges, fist and knee strikes to Mr. Coster while he was prostrate.**

65.     Shortly after discharging the Taser, DFC Licato and DFC Majewski dragged Mr. Coster from the car.  On information and belief, DFC Majewski delivered a Taser stun drive to Mr. Coster while he was lying on the ground next to the car, which is where DFC Majewski had the clearest access to Mr. Coster's leg, to which DFC Majewski applied the stun drive.

66.     The Sheriff's Office CEW Policy provides that "[i]f the first application of the CEW appears to be ineffective in gaining control of a subject, the deputy ***shall evaluate*** the situation and consider certain factors before additional applications of the CEW, including whether: a. it is reasonable to believe that the need to control the individual outweighs the potentially increased risk posed by multiple applications; b. the probes are making proper contact; c. the individual has the ability and has been given a reasonable opportunity to comply; and d. verbal commands, other options or tactics may be more effective."  Notwithstanding this policy, DFC Majewski deployed the Taser repeatedly—doing so without the need for additional applications to control Mr. Coster and without affording Mr. Coster a reasonable opportunity to comply.

739480580.8 8-JAN-21 23:37

67.     When DFC Majewski finally set aside the Taser, DFC Majewski proceeded to hit Mr. Coster with—in DFC Majewski's words—"closed fist and knee strikes," while Mr. Coster was lying on the ground next to the car.  Mr. Coster did not move from the ground or fight back while DFC Majewski assailed him. DFC Licato stood nearby and observed while this was happening.

**C.      Third Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Stripping, punching and tackling Mr. Coster while moving him from the ground beside his car to the ground a few feet away, on the Detention Center lawn.**

68.     Once DFC Majewski was done pummeling Mr. Coster while he was down, DFC Majewski and DFC Licato pulled Mr. Coster to his feet.  At the same time, they also pulled Mr. Coster's hooded sweatshirt over his head, restricting his ability to move, communicate, or see— effectively blinding him.   Seconds later, DFC Majewski began to punch downward into Mr. Coster's face, which was still covered with his hooded sweatshirt.

69.     DFC Majewski and DFC Licato then forced Mr. Coster away from the car, causing Mr. Coster's pants to fall to his ankles, leaving him exposed from the waist down at a public facility in the winter.  Mr. Coster, an extremely pious man, was highly embarrassed due to his involuntary exposure to numerous Sheriff's Office employees and his mother.

70.     It is evident from video of the incident that Mr. Coster did not attack the officers, and could not have done so because he was under the control of the Sheriff's deputies, who were guiding his movements and administering additional punches to his head.

**D.      Fourth Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Continuing to deliver closed fist and knee strikes to Mr. Coster while seven deputies held him immobile on the ground.**

71.     DFC Majewski and DFC Licato then tackled Mr. Coster to the ground.  Within the next ten to fifteen seconds, five additional Sheriff's deputies, including Defendant Bliss, joined

DFC Licato and DFC Majewski in a dogpile on top of Mr. Coster, bringing the total number of deputies bearing down on Mr. Coster to seven.

72.     Over the next two minutes, with a total of seven deputies on Mr. Coster, DFC Majewski continued to pummel Mr. Coster with—in DFC's Majewski's own words, "fist strikes and knee strikes."  During this time, DFC Majewski was kneeling on Mr. Coster's back and neck while other officers were striking Mr. Coster or pressing their knees, elbows or bodies down into him.  Mr. Coster made no visible movements during this time.

73.     After being beaten and piled on, Mr. Coster was left to lay on the ground for another six minutes without any physical interaction from Sheriff's deputies.  During this time, Mr. Coster did not move, other than occasionally writhing in pain.

74.     On information and belief, the Deputy and Officer Defendants who participated in the events above, including utilizing excessive force on Mr. Coster, included Mark Jeric, Bliss, Matthew Norton, Robinson, D. Seman, Stavros Kalambihis, Joe DiBartolo and/or Does 1 to 10.

**E.      Fifth Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Lifting Mr. Coster by his cuffed hands, dislocating his shoulder.**

75.     After placing Mr. Coster in handcuffs and leg irons, the Sheriff's Office employees then detained Mr. Coster in place, keeping him standing beside his mother's car for another 15 minutes.

76.     Sheriff's Office employees should have utilized this lengthy interval to afford Mr. Coster reasonable accommodations for his mental health disability, such as calling in personnel qualified to communicate with Mr. Coster during a mental health episode and assisting Mr. Coster to receive appropriate medical treatment.  They failed to do so.

77.     Instead, after the lengthy idle period, Sheriff's Office deputies took Mr. Coster into the Detention Center.  In doing so, the Deputies literally lifted Mr. Coster off of the ground by his

19

hands, which were handcuffed behind his back. On information and belief, this is when the Deputies dislocated Mr. Coster's shoulder.

78.     Lifting a prisoner who has been restrained in handcuffs (and leg irons) by his hands is wholly unnecessary and certain to cause torturous, excruciating pain.  Lifting prisoners in this manner has been recognized as a method of torture.

79.     Deputies were so aggressive in lifting Mr. Coster by his handcuffs that they actually flipped him upside down, and the deputies carried Mr. Coster into the Harford County Detention Center with his feet in the air and his head just above the pavement.

80.     On information and belief, the Deputy and Officer Defendants who participated in the events above, including utilizing excessive force on Mr. Coster, included Mark Jeric, Bliss, Matthew Norton, Robinson, D. Seman, Stavros Kalambihis, Joe DiBartolo and/or Does 1 to 10.

**F.     Mr. Coster's Injuries**

81.     As a direct result of the excessive force the Sheriff's Office employees inflicted on Mr. Coster, his left shoulder was dislocated, he had extensive lacerations and bruising, including a bruised and/or fractured rib, his clothes were bloodied, and his glasses were broken.  A medical assessment of Mr. Coster on March 9, 2018—approximately two months after the incident—indicated that he still had ankle abrasions and bruises on his body. Photos taken from the Detention Center incident show that Mr. Coster's face was bruised and bloodied, and that he was bleeding from his head and ankle.

82.     Ms. Coster was forced to watch helplessly as the events described above occurred. The stress of the event caused Ms. Coster to cry herself to sleep at night.  Not long after the incident, she began to suffer from heart failure.[8]

83.     When Ms. Coster convinced Mr. Coster to drive to the Detention Center that morning, she was looking for help and trusted the Sheriff's Office to provide it.  Instead, Mr. Coster was assaulted because Defendants wrongly perceived him as a threat due to his mental health disability, and injured him to the point that he required hospitalization.

## VII     MR. COSTER'S CONFINEMENT AT THE HARFORD DETENTION CENTER

84.     Mr. Coster was confined in the Harford County Detention Center immediately after the events described above.  At the time of his incarceration on January 10, 2018, the Harford County Detention Center and the Harford County Sheriff's Office were aware that Mr. Coster had been diagnosed as Bipolar, that he was suffering from an acute mental health crisis, and that he was injured, including a dislocated shoulder, from his encounter with the Sheriff's Office deputies.

85.     It was apparent to the Harford County Detention Center and the Harford County Sheriff's Office that Mr. Coster's ability to communicate and engage in decision making were being adversely affected by his mental health.

86.     The  Harford County Detention Center and the Harford County Sheriff's Office should have reasonably accommodated Mr. Coster's disability by ensuring that there were professionals who were qualified to communicate with him, but they failed to do so.  As a result, the Harford County Detention Center and the Harford County Sheriff's Office left Mr. Coster to

---

[8] While it is not possible to know if this is connected to the incident, WebMD explains, "[i]ntense grief, acute anger, and sudden fear can have direct -- sometimes fatal -- effects on the human heart."

suffer in intense and unnecessary pain, rather than receive prompt medical treatment for his injuries.

87.     Sheriff's Office employees, including Warden Michael Capasso and the other Individual Defendants, especially those who had lifted Mr. Coster off the ground by his wrists when he was handcuffed and carried him into the Harford County Detention Center upside down, had actual knowledge that Mr. Coster's shoulder was dislocated, that he was in excruciating pain, and that he was in need of immediate medical attention, but were deliberately indifferent to his pain, suffering, and medical needs.

## VIII   SHERIFF'S OFFICE MISCONDUCT ON JANUARY 11, 2018

88.     It was only on the following day that the Sheriff's Office transport Mr. Coster to Upper Chesapeake Medical Center for treatment for the injuries caused by the Sheriff's Office.

89.     Defendants Sergeant Meador, DFC Joe DiBartolo and Corporal Goins assisted in the transport detail and provided security while Mr. Coster was being treated.

90.     The Harford County Sheriff's Office has a policy for the Security of Prisoners in Hospitals and EMS settings.  The policy provides for prisoners to be restrained during hospital admissions and treatment, setting forth in relevant part:

VII.   SECURITY/RESTRAINTS   DURING   ROUTINE   TREATMENT   AND ADMISSIONS
A. Leg irons and handcuffs are the custodial restraining devices used to restrain the prisoner unless the attending physician should request other devices which will not interfere with the patient's care. Flex cuffs are required in the critical care units, operating rooms and other specialty areas where the use of metal restraints conflict with the provision of medical care.

B. All prisoners, regardless of security status, shall be secured to the bed, wheelchair, etc., unless prohibited in writing by the physician. As a minimum, one arm and one leg shall be secured to the bed at all times unless restraints conflict with the provision of medical care.

VIII. SECURITY/RESTRAINTS DURING MEDICAL PROCEDURES

A. Prisoners in pre-op are to be restrained in a manner consistent with the operating room procedures using flex cuffs. Flex cuffs may be applied in a fashion that do not interfere with the operative procedure to be performed (one leg to the gurney, both legs together, one arm to the gurney, both arms together or whatever works to immobilize or sufficiently restrict movement) and will be applied prior to the removal of metal restraints.

91.     Consistent with the foregoing policy, during the time that Mr. Coster was in the hospital, his only limb that was not shackled to the bed was his left arm, the arm attached to his dislocated shoulder.

92.     Hospital staff attached a weighted medical device to Mr. Coster's dislocated shoulder in an attempt to reset it. The procedure required Mr. Coster to change positions on his hospital bed multiple times. Mr. Coster was "compliant and cooperative" during the initial evaluation and position changes, as acknowledged by the officers.

93.     Eventually, hospital staff instructed Mr. Coster to change positions so that he was lying on his stomach while still attached to the weighted medical device. As Mr. Coster changed positions and hospital staff began tightening the device, Mr. Coster became extremely agitated from the pain of the procedure. He yelled and tried to pull *away* from the hospital staff.

94.     Mr. Coster did not intentionally behave violently toward anyone in the room.  Sgt. Meador says that Mr. Coster kicked him—if so, it was inadvertent, and the prosecutor declined to prosecute Mr. Coster for charges that were filed in connection with the alleged incident.  A photograph of Sergeant Meador's face taken shortly after he claims Mr. Coster allegedly kicked him does not show any signs of injury, and Sergeant Meador told a nurse that he was fine.

95.     Mr. Coster, however, was not.  Jumping to the wrong conclusions because of Mr. Coster's mental health status, the Sheriff's Deputies rapidly escalated to an unnecessary and unconscionable level of violence.

96.     Sergeant Meador, on information and belief, instructed the hospital staff to leave the room. Once hospital staff left, Corporal Goins began striking Mr. Coster in the face. By the end of the incident, Mr. Coster's face and chest were bloody, and his clothing had to be cut away and discarded. The Sheriff's Office chose not to photograph Mr. Coster in the wake of this incident.

97.     On information and belief, no member of the CIT was assigned as part of Mr. Coster's security detail at the hospital, in contravention of Harford County Sheriff's Office policy and despite the prior day's disastrous events at the Detention Center. The Harford County Sheriff's Office should have assigned a CIT member to the detail. (In the alternative, if the Sheriff's Office employees present had CIT training, they were inadequately trained and/or failed to utilize that training.) Once again, the Sheriff's Office employees treated Mr. Coster as a criminal and failed to accommodate his obvious and known disabilities by giving him calm, space, time and having a mental health peer or professional approach him. Instead, multiple armed enforcers confronted him with similar methods and results to what the Sheriff's Office had done the day before.

98.     Even once Mr. Coster began to struggle against the pain in his arm, Mr. Coster was still entitled to reasonable accommodations in light of his mental health disability. Notably, Mr. Coster was restrained, affording the Sheriff's Office generous leeway to stand back, slow the interaction, communicate in a manner appropriate for an individual in the midst of an acute mental health crisis, and deescalate the situation. In the hospital setting, Sheriff's Office deputies were particularly well positioned to call for assistance and coordination with mental health practitioners, which would have been a reasonable accommodation for Mr. Coster's disability, but they did not. Further, before he began to experience excruciating pain, Mr. Coster had been conducting himself in a calm and cooperative manner. There was every reason to believe that the situation could have

24

been handled without injuring Mr. Coster further, if Sheriff's Office employees had made reasonable accommodations for his disability.

99.     For the second time in two days, the Sheriff's Office acted based on fear, ignorance and pernicious bias against the mentally ill, grossly misjudged how best to handle the situation, and needlessly inflicted serious physical and mental trauma on Mr. Coster.

**COUNT I:  VIOLATION OF TITLE II**
**OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 *ET SEQ.* –**
**FAILURE TO PROVIDE REASONABLE ACCOMODATIONS**
**Against Defendant State of Maryland**

100.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

101.     Title II of the Americans with Disabilities Act ("ADA") and its implementing regulations provide that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

102.     Title II further provides that a public entity shall make reasonable modifications to its policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

103.     Title II further provides that a public entity shall, among other things, ensure that communications with "applicants, participants, members of the public, and companions with disabilities" are as effective as communications with others. 28 C.F.R. § 35.160(a).

104.     At all times relevant to this action, Mr. Coster had a mental health disability, Bipolar Disorder, which substantially limits the major life activities of communicating, concentrating, thinking, and learning; thus, Mr. Coster was and is a qualified individual with a disability within the meaning of the ADA, as he was physically present in Harford County, he was

otherwise qualified to participate in or benefit from the programs or services offered by the Harford County Sheriff's Office and/or Harford County Detention Center.

105.    Defendant State of Maryland was, at all times relevant to this action, the public entity obligated to (i) ensure that Mr. Coster, as a qualified individual with a disability, was afforded an opportunity to participate in the programs, services, and activities offered by the Harford County Sheriff's Office and Harford County Detention Center without being discriminated against and (ii) make reasonable modifications in policies, practices, or procedures when necessary to avoid disability-related discrimination.

106.    At all times relevant to this action, the Individual Defendants, as well as deputies and other personnel of the Harford County Sheriff's Office engaged in the initial interaction, arrest, detention or transport of Mr. Coster had notice that Mr. Coster had a mental health disability.

107.    Despite being aware of Mr. Coster's mental health disability, the Individual Defendants failed to provide any accommodations during their initial interaction with and eventual arrest of Mr. Coster. Among other things, the Individual Defendants failed to provide reasonable accommodations such as (i) requesting or directing Mr. Coster to mental health resources without resorting to the use of public law enforcement, (ii) providing time and space to calm the situation and communicate clearly and in a non-threatening manner or (iii) requesting and properly utilizing crisis intervention trained officers to deescalate the situation.

108.    Instead of providing reasonable accommodations, including the accommodations described above, the Individual Defendants relied upon stereotypes and presumptions related to Mr. Coster's being a person with a mental illness to launch into illegal conduct and unreasonable use of force against Mr. Coster with the assistance of other officers and employees.

739480580.8 8-JAN-21 23:37

109.    Officers and employees of the Harford County Sheriff's Office and/or Harford County Detention Center further failed to provide reasonable modifications in connection with Mr. Coster's need for medical treatment following his arrest, including, for example, utilizing properly-trained and experienced personnel to communicate with Mr. Coster regarding his need for medical treatment and any potential concerns.

110.    Defendants Meador, Goins, and DiBartolo further failed to provide reasonable accommodations in connection with Mr. Coster's transport to Upper Chesapeake Medical Center for treatment of injuries sustained during his arrest, including failing to utilize properly-trained and experienced personnel to effectively communicate with Mr. Coster.

111.    Defendants Meador, Goins, and DiBartolo further failed to provide reasonable modifications to Defendants' policy for Security of Prisoners in Hospitals and EMS Settings or to modify security procedures and practices to avoid using force.

112.    Defendants Meador, Goins, DiBartolo, and the Individual Defendants knew or should have known that a failure to provide reasonable modifications during the initial interaction, eventual arrest, and transportation to the hospital of Mr. Coster was substantially likely to harm a federally-protected right of Mr. Coster under the ADA. Despite this likelihood, Defendants failed to provide reasonable modifications.

113.    Through the acts and omissions described above and alleged in paragraphs 43-99, Defendants Meador, Goins, DiBartolo, and the Individual Defendants acted with discriminatory animus towards Mr. Coster because of his disability and deprived him of equally effective communication to that which is provided to non-disabled individuals or, at the very least, deliberate indifference towards Mr. Coster's federally-protected rights.

114.     As a result of these acts or omissions, Defendants Meador, Goins, DiBartolo, and the Individual Defendants caused Mr. Coster to be treated as a second-class citizen due to his disability, arrested, deprived of equally effective communication as that of a non-disabled individual, sustain significant injuries, and to suffer avoidable embarrassment, stress, and exacerbation of his Bipolar I Disorder.

115.     The Individual Defendants and other officers and employees acted under color of law and on behalf of the Harford County Sheriff's Office and/or Harford County Detention Center, which approved and/or condoned their actions. As such, any liability on the part of the Individual Defendants and other officers and employees is imputed to Defendant State of Maryland.

## COUNT II:  VIOLATION OF TITLE II
## OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 *ET SEQ.* –
## FAILURE TO TRAIN
### Against Defendant State of Maryland

116.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

117.     In order to comply with the non-discrimination mandate of Title II of the ADA, it is often necessary to provide training to public employees about disability, including to officers, as to how to interact with individuals with disabilities in the course of an investigation or arrest.

118.     Title II further provides that a public entity shall administer services, programs, and activities in the most integrated setting consistent with an individual with a disability's needs. 28 C.F.R. § 35.130(d).

119.     Title II further provides that a public entity may not utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or that have the purpose or effect of defeating or

substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3).

120.    Defendant State of Maryland and the Harford County Sheriff's Office have a duty to properly train officers and employees about disability and their duty to comply with the ADA.

121.    On information and belief, neither the Harford County Sheriff's Office or Defendant State of Maryland provide adequate training about how to interact with individuals with disabilities to all officers or employees who may reasonably encounter such individuals.

122.    The failure by the Harford County Sheriff's Office and Defendant State of Maryland to properly train the Individual Defendants is a violation of Title II of the ADA.

123.    As a result of the failure by Defendant State of Maryland and Harford County Sheriff's Office to train its officers and employees on how to interact with individuals with disabilities, Defendants failed to ensure that Mr. Coster's need for mental health treatment was addressed in the most integrated setting consistent with his needs, diversion to a community hospital as Ms. Coster had sought or contacting mobile crisis services for intervention and referrals. Instead, Defendants unnecessarily subjected Mr. Coster to law enforcement and the criminal justice system rather than address his mental health needs.

124.    As a result of the failure by Defendant State of Maryland and Harford County Sheriff's Office to train its officers and employees on how to interact with individuals with disabilities, Defendants Meador, Goins, DiBartolo, and the Individual Defendants caused Mr. Coster to be treated as a second-class citizen due to his disability, arrested, deprived of equally effective communication as for a non-disabled individual, sustain significant injuries, be confined in a restrictive, segregated setting, and to suffer avoidable embarrassment, stress, and exacerbation of his Bipolar I Disorder.

739480580.8 8-JAN-21 23:37

125.    By failing to train its officers or employees on how to interact with individuals with disabilities and by failing to develop, maintain, and enforce policies that serve to ensure individuals experiencing mental health crises are not subjected to the criminal justice system without cause, Defendant State of Maryland and Harford County Sheriff's Office have used criteria or methods of administration that serve to subject individuals with disability to discrimination while simultaneously defeating or substantially impairing the purpose of both the Sheriff's Office's law enforcement and crisis intervention objectives.

### COUNT III: VIOLATIONS OF SECTION 504
#### OF THE REHABILITATION ACT OF 1973 – 29 U.S.C. § 794 *ET SEQ.*
#### Against Defendant State of Maryland

126.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

127.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

128.    On information and belief, the Harford County Sheriff's Office and/or Harford County Detention Center receives federal financial assistance and is thus subject to the requirements of Section 504.

129.    On information and belief, as a condition of receipt of federal funds, Harford County Sheriff's Office and Harford County government are required to certify that they are in compliance with federal civil rights statutes, including Section 504's requirement that governmental entities not discriminate against individuals with disabilities.

130.    Through the acts and omissions described above and alleged in paragraphs 43-99, Defendants Meador, Goins, DiBartolo, and the Individual Defendants discriminated against Mr.

30

Coster solely based on his mental health disability.  Were it not for Defendants Meador, Goins, DiBartolo's preconceived and erroneous notions about mentally ill individuals, they would never would had perceived Mr. Coster—a 145 pound man who was injured, shacked to a hospital bed, and not behaving violently toward anyone, but who they knew was bipolar—as a threat, let alone would two of the officers have held his him while a third hit him in the face.

131.    Similarly, Were it not for the Individual Defendants' preconceived and erroneous notions about mentally ill individuals, they would never would had perceived Mr. Coster—a 145 pound man who sitting in his mother's car and not behaving violently toward anyone, but who they knew was bipolar—as a threat, let alone tased him within seconds of his replies that "Everything will be OK," followed-up with prolonged punches with closed fists, knee strikes, placed their knees on his back and neck, and lifted his by his wrists when his hands were cuffed behind his back.

132.    As a result of these acts or omissions, Defendants Meador, Goins, DiBartolo, and the Individual Defendants caused Mr. Coster to be treated as a second-class citizen due to his disability, arrested, deprived of equally effective communication as for a non-disabled individual, sustain significant injuries, and to suffer avoidable embarrassment, stress, and exacerbation of his Bipolar I Disorder.

133.    The Individual Defendants and other officers and employees acted under color of law and on behalf of the Harford County Sheriff's Office and/or Harford County Detention Center, which approved and/or condoned their actions. As such, any liability on the part of the Individual Defendants and other officers and employees is imputed to Defendant State of Maryland.

### COUNT IV:  VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEIZURE
**Against the Individual Defendants**

134.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

135.    Plaintiff asserts this count under 42 U.S.C. § 1983 against the Individual Defendants.

136.    The Individual Defendants were, at all times relevant to the actions alleged herein, officers of the Harford County Sheriff's Office and thus persons acting under color of state law within the meaning of Section 1983.

137.    When the Individual Defendants continued to interact with Mr. Coster after he assured the Defendants that "everything is okay" and proceeded to forcibly remove Mr. Coster from his vehicle, the Individual Defendants seized Mr. Coster under color of law.

138.    At no time did the Individual Defendants have a warrant or probable cause to arrest or detain Mr. Coster, nor did they ask any investigative questions or use the seizure of Mr. Coster to pursue any further investigation.

139.    Additionally, the Individual Defendants did not have reasonable suspicion to support any seizure of Mr. Coster for the purposes of further investigation.

140.    There was no indication of any trouble, hazards, or illegal activity upon the Individual Defendants' observation of Mr. Coster or his vehicle, and nothing observed by the officers provided any basis to suspect that Mr. Coster had committed a crime.

141.    Under the circumstances, Mr. Coster had a clear and well-established right not to be seized without cause or justification such that a reasonable officer would understand that such a seizure would violate Mr. Coster's rights under the Fourth Amendment.

142.    The Individual Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Mr. Coster's rights under the Fourth Amendment.

## COUNT V:  VIOLATION OF THE FOURTH AMENDMENT – EXCESSIVE FORCE
### Against the Individual Defendants

143.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

144.     Plaintiff asserts this count under 42 U.S.C. § 1983 against the Individual Defendants.

145.     The Individual Defendants were, at all times relevant to the actions alleged herein, officers of the Harford County Sheriff's Office and thus persons acting under color of state law within the meaning of Section 1983.

146.     The Individual Defendants engaged in conduct, described above and alleged in paragraphs 43-87, that constituted excessive force, far beyond that which a reasonable officer would have used in the initial detention and eventual arrest of Mr. Coster.

147.     The Individual Defendants did not have a reasonable basis to believe that Mr. Coster had committed a crime, let alone a crime requiring the use of substantial force to effect Mr. Coster's detention and eventual arrest.

148.     The Individual Defendants did not have a reasonable basis to believe that Mr. Coster was armed or that Mr. Coster posed an immediate threat to the safety of the Individual Defendants, or to any other person present at the time.

149.     Nonetheless, the Individual Defendants used an objectively unreasonable level of force in Mr. Coster's initial detention and eventual arrest to such an extent that Mr. Coster was injured as set forth herein.

150.     Under the circumstances, Mr. Coster had a clear and well-established right not to be tased, beaten, and otherwise subjected to excessive force by officers such that a reasonable

739480580.8 8-JAN-21 23:37

officer would understand that such actions would violate Mr. Coster's rights under the Fourth Amendment.

151.    The Individual Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Mr. Coster's rights under the Fourth Amendment.

### COUNT VI:  VIOLATION OF THE FOURTEENTH AMENDMENT – EXCESSIVE FORCE
### Against Defendants Meador, Goins, and DiBartolo

152.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

153.    Plaintiff asserts this count under 42 U.S.C. § 1983 against Defendants Meador, Goins, and DiBartolo.

154.    Defendants Meador, Goins, and DiBartolo were, at all times relevant to the actions alleged herein, officers of the Harford County Sheriff's Office and thus persons acting under color of state law within the meaning of Section 1983.

155.    Defendants Meador, Goins, and DiBartolo engaged in conduct, described above and alleged in paragraphs 88-99, that constituted excessive force, far beyond that which a reasonable officer would have used to detain Mr. Coster for the purposes of medical treatment.

156.    Particularly given that Mr. Coster was substantially restrained in connection with an ongoing medical procedure, Defendants Meador, Goins, and DiBartolo did not have a reasonable basis to believe that Mr. Coster posed an immediate threat to the safety of Defendants Meador, Goins, and DiBartolo, medical staff, or to any other person present at the time.

157.    Nonetheless, Defendants Meador, Goins, and DiBartolo used an objectively unreasonable level of force in subduing Mr. Coster to such an extent that Mr. Coster was unnecessarily injured as set forth herein.

739480580.8 8-JAN-21 23:37

158.     Under the circumstances, Mr. Coster had a clear and well-established right not to be subjected to excessive force by officers such that a reasonable officer would understand that such actions would violate Mr. Coster's rights under the Fourteenth Amendment.

159.     Defendants Meador, Goins, and DiBartolo engaged in this conduct under color of law and such conduct constituted callous indifference to and reckless disregard of Mr. Coster's rights under the Fourteenth Amendment.

## COUNT VII:  VIOLATION OF THE FOURTEENTH AMENDMENT – CONDITIONS OF CONFINEMENT
**Against Defendants County Commissioners of Harford County and Harford County Sheriff**

160.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

161.     Plaintiff asserts this count under 42 U.S.C. § 1983 against Defendants County Commissioners of Harford County and Defendant Harford County Sheriff.

162.     Defendant County Commissioners of Harford County and Defendant Harford County Sheriff were, all times relevant to the actions alleged herein, state actors and persons acting within color of state law within the meaning of Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

163.     Defendant County Commissioners of Harford County is a person within the meaning of Section 1983, see *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Harford County Sheriff had the authority to make policy, and made policy, on behalf of the county with respect to the Harford County Detention Center.

164.     In order to prevent violations of the constitutional rights of inmates and others entrusted to the care of the Harford County Detention Center, it is necessary to provide training

about disability, including to officers and employees as to how to interact with individuals with disabilities entrusted to their care.

165.    The Harford County Detention Center had a duty to properly train officers and employees about individuals with disabilities, including those with mental health disabilities.

166.    On information and belief, the Harford County Detention Center did not provide adequate training about how to interact with individuals with disabilities to all officers or employees who may reasonably encounter such individuals.

167.    As a result of this failure, Mr. Coster was, unnecessarily and for an extended period of time, denied care for a serious medical need—among other things, a dislocated shoulder. Proper training of the officers and employees charged with Mr. Coster's care, including training to improve communication with those with mental health disabilities and training to require immediate evaluation and provision of medical care—including mental health screening and appropriate diversion to an alternate facility as appropriate, would have ensured earlier, more effective intervention to address Mr. Coster's injuries. Instead, Mr. Coster was subjected to punishment by extended, unnecessary pain while his injuries remained unaddressed.

168.    The Harford County Detention Center's failure to adequately train its officers and employees to engage with individuals with disabilities, including those with mental health disabilities, amounts to deliberate indifference to those individuals' constitutional rights.

### COUNT VIII:  FALSE ARREST – MARYLAND COMMON LAW
#### Against the Individual Defendants

169.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

170.    By effecting an initial detention of Mr. Coster without cause, the Individual Defendants, as described above and alleged in paragraphs 43-87, deprived Mr. Coster of his liberty without his consent and without legal justification for such detention.

171.    As a direct, proximate, and consequential result of the conduct by the Individual Defendants, as described above, Mr. Coster sustained significant injuries as set forth herein.

## COUNT IX:  BATTERY – MARYLAND COMMON LAW
### Against the Individual Defendants

172.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

173.    The conduct of the Individual Defendants, described above and alleged in paragraphs 43-87, including (1) tasing Mr. Coster in "probe mode;" (2) tasing Mr. Coster with  a "stun drive," (3) punching Mr. Coster while he was prostrate on the ground, standing and/or sitting; (4) kneeing Mr. Coster while he was prostrate on the ground; (5) kneeling on Mr. Coster, including on his back and neck; (6) tackling and pinning Mr. Coster; (7) stripping Mr. Coster naked; (8) pulling Mr. Coster's handcuffed wrists upward behind his back, lifting him off the ground; and (9) carrying Mr. Coster upside down, constituted an intentional, unwelcome, and unprivileged touching of Mr. Coster and was undertaken deliberately and with actual malice.

174.    As a direct, proximate, and consequential result of the conduct by the Individual Defendants, as described above, Mr. Coster sustained significant injuries as set forth herein.

## COUNT X:  BATTERY – MARYLAND COMMON LAW
### Against Defendants Meador, Goins, and DiBartolo

175.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

176.    The conduct of Defendants Meador, Goins, and DiBartolo, described above and alleged in paragraphs 88-99, including (1) grabbing, holding, pinning or controlling Mr. Coster's body and (2) punching or striking Mr. Coster, constituted an intentional, unwelcome, and unprivileged touching of Mr. Coster and was undertaken deliberately and with actual malice.

177.    As a direct, proximate, and consequential result of the conduct of Defendants Meador, Goins, and DiBartolo, as described above, Mr. Coster sustained significant injuries as set forth herein.

## RELIEF REQUESTED

178.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and grant the following:

179.    Declare the Defendant State of Maryland violated Mr. Coster's rights under the ADA and Section 504 of the Rehabilitation Act to be free from disability discrimination;

180.    Declare that the Individual Defendants violated Mr. Coster's rights under the Fourth Amendment to be free from the use of excessive force against his person;

181.    Declare that the Individual Defendants violated Mr. Coster's rights under the Fourth Amendment to be free from unreasonable seizure;

182.    Declare that Defendants Harford County, Harford County Sheriff's Office, and Harford County Detention Center violated Mr. Coster's rights under the Fourteenth Amendment to be free from unreasonable conditions of confinement;

183.    Declare that the Individual Defendants violated Mr. Coster's rights under Maryland law to be free from battery;

184.    Declare that Defendants Licato and Majewski violated Mr. Coster's rights under Maryland law to be free from false arrest;

185.    To enjoin the State of Maryland, its employees, agents, and any and all persons acting on the State of Maryland's behalf from further violations of the ADA, Section 504 of the Rehabilitation Act, and the Fourth Amendment;

186.    Enjoin the Defendants from using the techniques of law enforcement applicable to persons suspected of wrongdoing when interacting with persons with mental health disabilities unless those persons are reasonably suspected of criminal wrongdoing and exhibiting visible indicia of being a risk to themselves or others, and directing Defendants instead to utilize non-law

enforcement mechanisms, such as mobile crisis response, referrals to mental health practitioners, and peer-to-peer support, in such situations.

187.    Award to Mr. Coster his reasonable actual damages as compensation for injuries sustained as a result of (i) Defendant State of Maryland's violations of Section 504 of the Rehabilitation Act, (ii) all Individual Defendants' violations of Mr. Coster's rights under the Fourth Amendment and Maryland law; and (iii) Defendants Harford County, Harford County Sheriff's Office, and Harford County Detention Center's violations of Mr. Coster's rights under the Fourteenth Amendment;

188.    Award to Mr. Coster his reasonable damages as compensation for his pain and suffering as a result of (i) Defendant State of Maryland's violations of Section 504 of the Rehabilitation Act, (ii) all Individual Defendants' violations of Mr. Coster's rights under the Fourth Amendment and Maryland law; and (iii) Defendants Harford County, Harford County Sheriff's Office, and Harford County Detention Center's violations of Mr. Coster's rights under the Fourteenth Amendment;

189.    Award Mr. Coster punitive damages for the Individual Defendants' callous indifference and reckless disregard of Mr. Coster's rights under the Fourth Amendment, the Individual Defendants' willful and outrageous conduct under Maryland Law, and Defendants Harford County, Harford County Sheriff's Office, and Harford County Detention Center's callous indifference and reckless disregard of Mr. Coster's rights under the Fourteenth Amendment;

190.    Award Mr. Coster his costs and reasonable attorneys' fees; and

191.    Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

192.    Plaintiff requests a trial by jury on any and all issues raised by this Complaint which

are triable by right of a jury.


January 8, 2021                                    Respectfully submitted,


 /s/     Luciene M. Parsley
Luciene M. Parsley (Fed. Bar #27089)
Disability Rights Maryland
1500 Union Ave., Suite 2000
Baltimore, Maryland  21211
Phone:  (410) 727-6352 x2494
Facsimile: (410) 727-6389
LucieneP@DisabilityRightsMD.org

WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
 /s/Jonathan M. Smith
Jonathan M. Smith*
Jacqueline Kutnik-Bauder*
Margaret Hart*
Tristin Brown (MD Bar 21321)
700 14th Street NW, Suite 400
Washington, D.C. 20005
Tel: 202-319-1000
Fax: 202-319-1010
Email: jonathan_smith@washlaw.org
jacqueline_kutnik-bauder@washlaw.org
margaret_hart@washlaw.org
tristin_brown@washlaw.org
* Pro hac vice application pending

 /s/_ Reginald Goeke
Reginald Goeke
Federal Bar Number 13527
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3312
RGoeke@mayerbrown.com

41

Alex Lakatos
(*pro hac vice* admission application to be filed)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3312
ALakatos@mayerbrown.com

Brad Resnikoff
(*pro hac vice* admission application to be filed)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3110
BResnikoff@mayerbrown.com

Kelly Truesdale
(*pro hac vice* admission application to be filed)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3294
KTruesdale@mayerbrown.com

Daniel Pearson
(*pro hac vice* admission application to be filed)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3764
DPearson@mayerbrown.com

*Counsel for Plaintiff*

739480580.8 8-JAN-21 23:37