**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| RODNEY COSTER<br>c/o Mayer Brown LLP<br>1999 K Street, N.W.<br>Washington, DC 20006 | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 21-cv-65 |
| v. | ) ) | |
| THE STATE OF MARYLAND,<br>HARFORD COUNTY SHERIFF'S<br>OFFICE, HARFORD COUNTY<br>DETENTION CENTER,<br>WARDEN MICHAEL CAPASSO,<br>DFC DONALD LICATO, DFC<br>CHRISTOPHER MAJEWSKI, DFC<br>MARK JERIC, DFC BLISS, DFC<br>NORTON, DFC ROBINSON, DFC<br>D. SEMAN, DFC STAVROS<br>KALAMBIHIS, SGT. ANDREW<br>MEADOR, CPL. GOINS,<br>DFC JOE DIBARTOLO,  AND<br>DOES 1 TO 20 | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) ) ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiff Rodney Coster ("Mr. Coster"), for his Complaint against Defendants the State of

Maryland, the Harford County Sheriff's Office ("Sheriff's Office"), the Harford County Detention

Center, Harford County Warden Michael Capasso, Harford County Sheriff's Officers Sgt. Andrew

Meador, Cpl. Nicholas Goins, and Harford County Sheriff's Deputies Donald Licato, Christopher

Majewski, Matthew Norton, Bliss, Mark Jeric, Robinson, D. Seman, Stavros Kalambihis, Joe

DiBartolo, and Does 1 to 20 (collectively, the foregoing individuals and Does 1 to 20 are the "Individual Defendants"), by and through counsel, alleges as follows:

## I        INTRODUCTION

1.        On January 10, 2018, Mr. Coster went to visit his mother, Sharon Coster ("Ms. Coster") for her birthday.  Ms. Coster immediately realized that Mr. Coster—who had been diagnosed with Bipolar I Disorder decades ago—was having a mental health crisis and was not making sense.  Recognizing that her son needed professional mental and psychological care, she persuaded him to drive her to the Harford County Sheriff's Office located at the Harford County Detention Center, so that she could help him to get help.

2.        When Ms. Coster and Mr. Coster arrived at the Harford County Detention Center, they parked in the driveway in front of the building and sat in the car until two Sheriff's Office deputies, Deputy First Class ("DFC") Licato and DFC Majewski, pulled up in front of them in a Sherriff's Office cruiser.  Ms. Coster then got out of her car, calmly walked over to DFC Licato, and spoke with him beside his cruiser.  Ms. Coster explained that Mr. Coster was bipolar and was not taking his medicine, and that she wanted the Sheriff's Office deputies to assist him in getting help.  She asked the deputies not to hurt Mr. Coster.  Ms. Coster was available to provide more information to DFC Licato, and was trying to do so, but DFC Licato hurried off before she could provide more details.  In the meantime, Mr. Coster sat and waited patiently in his mother's car.

3.        In response, DFC Licato and DFC Majewski chose to treat Mr. Coster—who was over 50 years old, weighs only 145 pounds and is just a little over 5 feet tall, and was completely unarmed—as a criminal suspect.  They chose not to direct Ms. Coster and Mr. Coster to a medical or psychiatric facility, or call professional mental health care providers, or utilize the Sheriff's Office Crisis Intervention Team—a team of individuals specifically trained to work with citizens

741503335.2 7-MAY-21 19:12

experiencing mental health crises in order to deescalate those situations and prevent criminal justice involvement.

4.      Deputies Majewski and Licato went over to the car where Mr. Coster had been waiting and demanded his license (which he provided) and began to question him.  When Mr. Coster responded in the manner of a person in the midst of an acute mental health crisis by saying that no one could help him and repeating over and over, largely to himself, that "everything's going to be OK," the deputies reacted in a way that they never would have, but for Mr. Coster's mental health issues.

5.      Deputies Majewski and Licato briefly tried to pull Mr. Coster out of the car and then DFC Majewski drew his Taser, aimed it at Mr. Coster, and repeatedly tased him.

6.      Deputies Majewski and Licato then removed Mr. Coster from the car and pulled his sweatshirt over his head, effectively blinding him.  With Mr. Coster outside of the car (at times standing but doubled over and at times lying on the asphalt next to the car), one of the deputies repeatedly punched and kneed Mr. Coster, including delivering several overhand "hammer-fist" punches to the back of Mr. Coster's head.

7.      Deputies Majewski and Licato then moved Mr. Coster from the pavement beside his mother's car and onto the adjacent lawn in front of the detention center.  In the process, they caused his pants to fall down—exposing him in front of his mother, who helplessly watched in horror.

8.      Within the next twenty seconds, a total of at least seven Individual Defendants piled on top of Mr. Coster, including, but not limited to, Warden Capasso, Deputies Majewski and Licato, and on information and belief, Defendants Jeric, Bliss, Norton, Robinson, Seman, and Kalambihis.  Under the weight of these Individual Defendants, Mr. Coster was unable to move.

Nevertheless, DFC Majewski continued to punch Mr. Coster while kneeling on his head and neck, while other Individual Defendants in the dogpile were striking Mr. Coster with their fists and knees.

9.      After several minutes, the Individual Defendants put Mr. Coster, who remained on the ground, in handcuffs and leg irons.  Even after Mr. Coster's hands were cuffed behind his back, several of the Individual Defendants continued to stand on Mr. Coster and to kneel on his back, neck and head.  Indeed, at least one Individual Defendant who had left the dogpile and walked away after Mr. Coster had been handcuffed *came back* to kneel on his head, back, and neck.  Other of the Individual Defendants milled around, watching.

10.      The Individual Defendants then stood in a circle around Mr. Coster while he lay handcuffed and immobile on the ground.  After about five minutes, medical personnel arrived and walked over to the circle of Individual Defendants surrounding Mr. Coster, but the Individual Defendants turned the medical personnel away and did not afford them access to Mr. Coster to treat his injuries.

11.      After the medical personnel left, Mr. Coster was left handcuffed and lying on the ground for around another five minutes, before Individual Defendants stood him up.  They kept him standing for 15 minutes, during which time they made no effort to provide him with medical care or accommodate his disability.

12.      Two of Individual Defendants then lifted Mr. Coster off the ground by his elbows while his arms were still cuffed behind his back, while they marched him toward the Harford County Detention Center.  This is a stress position that is highly painful and very likely to result in injuries.  (Amnesty International recognizes use of stress positions as a form of torture.)  It

caused Mr. Coster to double over in pain, and on information and belief, this is how Mr. Coster's shoulder was dislocated.

13.     The two Individual Defendants were so aggressive in lifting Mr. Coster by his elbows that Mr. Coster actually flipped over, and they carried him across the parking lot into the Harford County Detention Center upside down with his face just a few inches above the pavement.

14.     At no time during the events described above did Mr. Coster fight, attempt to fight, or otherwise actively resist the Individual Defendants.  Indeed, at the outset of the interaction he tried to shrink away from DFC Licato and DFC Majewski and turtle up inside of his mother's car. Moreover, for much of the time thereafter he could not even move, because he was pinned down by at least seven Individual Defendants, and then he was in handcuffs and leg irons.

15.     Despite Mr. Coster's obvious mental health crisis and severe physical discomfort, as well as the presence of an ambulance on the scene, the Sheriff's Office waited until the next day to take Mr. Coster to the hospital to have his injuries treated—treatment that the Sheriff's Office should have provided immediately, but, due to Mr. Coster's mental health disability, did not.

16.     The next day, Mr. Coster was transported to the hospital, accompanied by Corporal Goins, Sergeant Meador and DFC DiBartolo. At the hospital, Mr. Coster was shackled to the hospital bed by his legs and one of his arms (the other arm had a dislocated shoulder that required medical attention, and so was not shackled), restricting his movement.  When the pain of having his shoulder reset in the midst of a mental health crisis caused Mr. Coster to struggle—although it did not cause him to behave violently toward anyone—Corporal Goins began striking Mr. Coster in the face, while DFC DiBartolo and Sergeant Meador restrained Mr. Coster.  By the end of the beating, Mr. Coster's face and chest were so bloody that his clothes had to be cut off and thrown away.

17.     At no time during the beating did Mr. Coster fight, attempt to fight, or otherwise actively resist, nor could he have done so, as he was shackled to the hospital bed.

18.     Ms. Coster turned to the Sheriff's Office when she and her son needed help the most; she never imagined that he would be subjected to violence.  But instead of accommodating Mr. Coster's mental health disability by directing him to appropriately trained mental healthcare providers, or otherwise deescalating the situation, the Sheriff's Office and the Individual Defendants chose to criminalize Mr. Coster's mental illness.  Twice, they savagely and needlessly beat Mr. Coster and subjected him to an excruciating stress position, dislocating his shoulder in the process.  Their actions reflect bias against persons with mental health disabilities—persons who are, in fact, far more likely to be *victims* than perpetrators of violence.  That is exactly what happened here; that is exactly what necessitates this suit.

## II      JURISDICTION AND VENUE

19.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit asserts federal claims pursuant to the Americans with Disabilities Act, the Rehabilitation Act of 1973, and 42 U.S.C. § 1983.

20.     This court has jurisdiction over Mr. Coster's related claims asserted under Maryland law, which arise from the same nucleus of operative fact as the federal claims, pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, all defendants reside in the State of Maryland and Defendants Harford County Sheriff's Office and Harford County Detention Center reside in this district.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Mr. Coster's claims occurred in this district.

22.     Plaintiff has provided timely notice of the facts and circumstances giving rise to the claims against the State of Maryland herein and has received a final denial from the Treasurer of the State of Maryland, satisfying its obligations pursuant to Md. Code, State Gov't § 12-106.

## III     THE PARTIES

23.     Defendant State of Maryland is the State where the events alleged herein occurred. Employees of the Harford County Sheriff's Office, including the Individual Defendants and the Doe Defendants, are constitutional officers of the State of Maryland.  The State of Maryland is liable for the conduct of employees of the Harford County Sheriff's Office in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12010 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a).

24.     Defendant Harford County Sheriff's Office is the second largest Sheriff's office in Maryland and the primary law enforcement office responsible for servicing the population of Harford County.

25.     Defendant Harford County Detention Center is a detention center at 1030 Rock Spring Road, Bel Air, Maryland, which is located in Harford County, and where Mr. Coster was incarcerated after the January 10, 2018 incident in which the Individual Defendants violated Mr. Coster's rights as set forth herein.  On information and belief, the Harford County Detention Center is a division of Defendant Harford County Sheriff's Office.

26.     Defendant Michael Capasso was at all relevant times the Warden of the Harford County Detention Center and an employee of the Harford County Sheriff's Office.  As set forth below, Warden Michael Capasso participated in the excessive use of force on Mr. Coster, and engaged in other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his individual capacity.

27.     Defendant Christopher Majewski is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  His Harford County Sheriff's Office badge number is #953. DFC Majewski participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his individual capacity.

28.     Defendant Donald Licato is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  His Harford County Sheriff's Office badge number is #889.  DFC Licato participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018. He is named as a defendant in his individual capacity.

29.     Defendant Matthew Norton is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  Defendant Norton's Harford County Sheriff's Office badge number is #998. DFC Norton participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his individual capacity.

30.     Defendant Bliss is employed by the Harford County Sheriff's Office.  Defendant Bliss participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018. He is named as a defendant in his individual capacity.

31.     Defendant Mark Jeric is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  Defendant Jeric's Harford County Sheriff's Office badge number is #524.  On information and belief, DFC Jeric participated in the excessive use of force on Mr.

Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  He is named as a defendant in his individual capacity.

32.     Defendant D. Seman is employed by the Harford County Sheriff's Office. Defendant Seman's Harford County Sheriff's Office badge number is #881.  On information and belief, Defendant Seman participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018.  Defendant Seman is named as a defendant in his individual capacity.

33.     Defendant Stavros Kalambihis is employed by the Harford County Sheriff's Office. Defendant Kalambihis's Harford County Sheriff's Office badge number is #918.  On information and belief, Defendant Kalambihis participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, outside of Harford County Detention Center on January 10, 2018. Defendant Kalambihis is named as a defendant in his individual capacity.

34.     Defendant Andrew Meador is employed by the Harford County Sheriff's Office as a Sergeant.  Defendant Meador's Harford County Sheriff's Office badge number is #904.  Sgt. Meador participated in the January 11, 2018 assault on Mr. Coster at the Upper Chesapeake Medical Center, as set forth below.  Defendant Meador is named as a defendant in his individual capacity.

35.     Defendant Goins is employed by the Harford County Sheriff's Department as a Corporal.  Defendant Goins' Harford County Sheriff's Office badge number is #825.  Cpl. Goins participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, at the Upper Chesapeake Medical Center on January 11, 2018.  Defendant Goins is named as a defendant in his individual capacity.

36.     Defendant Joe DiBartolo is employed by the Harford County Sheriff's Office as a Deputy 1st Class ("DFC").  DFC DiBartolo's Harford County Sheriff's Office badge number is #933.  DFC DiBartolo participated in the excessive use of force on Mr. Coster, as set forth below, and other violations of Mr. Coster's rights, at the Upper Chesapeake Medical Center on January 11, 2018.  Defendant DiBartolo is named as a defendant in his individual capacity.

37.     Does 1 to 20 include other individuals who participated in the January 10, 2018 assault on Mr. Coster and other relevant events occurring outside of the Harford County Detention Center that day.  All but one appear to be white males. One is an African American male.  On information and belief, these may include employees of the Harford County Sheriff's Office with badge numbers 841, 523, 923, 899, 501, 604, and 751. The John Doe defendants are named as defendants in their individual capacities.

38.     Plaintiff Rodney Coster is a resident of Baltimore County, Maryland.  He suffers from a diagnosed mental health disability, Bipolar I Disorder.  As a person diagnosed with Bipolar I Disorder, Mr. Coster is a qualified person with a disability for purposes of the ADA.

## IV     THE DANGER POLICE ENCOUNTERS POSE TO PEOPLE WITH MENTAL HEALTH DISABILITIES

39.     Law enforcement officers are often ill-trained and ill-equipped to appropriately handle and deescalate encounters with citizens suffering from mental health disabilities, too often leading to tragic, and avoidable, consequences.

741503335.2 7-MAY-21 19:12

40.     Data indicate that individuals with disabilities have more interactions with police than individuals without disabilities, and at least 25 percent of all police killings are people in a mental health crisis.[1]

41.     Indeed, according to a *Washington Post* article tracking fatal police shootings (which are just one type of lethal force used by police), approximately 20% of those shot and killed suffered from mental illness.[2]  And a White Paper authored by David Perry and disability expert Lawrence Carter-Long noted that "[d]isabled individuals," including those with mental illness, "make up a third to half of all people killed by law enforcement."[3]

42.     Harmful stereotypes and social stigma concerning people with mental health disabilities contribute to their mistreatment.  Such disabilities are often—incorrectly—conflated with dangerousness,[4] and the media exacerbates and strengthens these stereotypes by sensationalizing violent crimes committed by individuals who are perceived as having mental health disabilities.[5]  Commentators have long noted that such harmful stereotypes have informed

---

[1] Mizner, Susan, "*Police 'Command and Control' Culture Is Often Lethal — Especially for People With Disabilities*," ACLU (May 10, 2018), https://www.aclu.org/blog/criminal-law-reform/reforming-police/police-command-and-control-culture-often-lethal-especially.

[2] *Fatal Force 999 People were Shot and Killed by Police in 2019*, Washington Post (Aug. 10, 2020), https://www.washingtonpost.com/graphics/2019/national/police-shootings-2019/.

[3] David M. Perry & Lawrence Carter-Long, *Media Coverage of Law Enforcement Use of Force and Disability*, Ruderman Family Foundation (Mar. 2016), https://rudermanfoundation.org/white_papers/media-coverage-of-law-enforcement-use-of-force-and-disability/.

[4] Mohit Varshney et al., *Violence and mental illness: what is the true story?*, 70 J. Epidemiol Community Health 223-225 (2016), https://jech.bmj.com/content/jech/70/3/223.full.pdf.

[5] Aaron Levin, *Media Cling to Stigmatizing Portrayals of Mental Illness*, Psychiatric News (Dec. 16, 2011), https://psychnews.psychiatryonline.org/doi/full/10.1176/pn.46.24.psychnews_46_24_16-a.

efforts to coerce individuals with mental health disabilities and jeopardize their fundamental human rights to bodily autonomy.[6]

43.     Any link between mental health disabilities and dangerousness has been strongly repudiated.  The medical community has provided consistent conclusions for years:  people with mental health disabilities are much more likely to be the *victims* of violent crime than they are to be perpetrators, and the vast majority of people with mental health disabilities are no more likely to be violent than any other person.[7]

## V     RODNEY COSTER

44.     Mr. Coster was born in in Baltimore, Maryland, in 1966.  He currently resides in Baltimore County, Maryland.

45.     Mr. Coster is a 54 year-old white male.  At 5'3" tall and weighing 145 pounds, he is small in stature.

46.     Mr. Coster earned his high school diploma in 1985, and for three years prior to the events set forth herein, he was employed to oversee and maintain a small chain of six convenience stores.  Mr. Coster's employer reports that Mr. Coster has "never missed work or been late," and "never had an issue at work."

---

[6]*E.g.*, Bernice A. Pescosolido et al., *The Public's View of the Competence, Dangerousness, and Need for Legal Coercion of Persons with Mental Health Problems*, 89 Am. J. Pub. Health 1339-1345 (Sept. 1999), https://ajph.aphapublications.org/doi/pdfplus/10.2105/AJPH.89.9.1339; Dainius Puras & Piers Gooding, *Mental Health and Human Rights in the 21st Century*, World Psychiatry 18:1 (Jan. 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6313250/pdf/WPS-18-42.pdf.

[7] U.S. Dep't of Health and Human Servs., *Mental Health Myths and Facts* (Aug. 29, 2017), https://www.mentalhealth.gov/basics/mental-health-myths-facts;  American Psychiatric Association, *APA Condemns Loss of Life from Gun Violence, Disputes Link to Mental Illness* (Aug. 5, 2019),  https://www.psychiatry.org/newsroom/news-releases/apa-condemns-loss-of-life-from-gun-violence-disputes-link-to-mental-illness.

47.     Mr. Coster has been married for over 20 years.  He is currently separated from his wife, with whom he remains very close friends. Mr. Coster's wife and mother continue to live in Harford County, and he continues to visit them on a regular basis.

48.     Mr. Coster was first diagnosed with Bipolar I disorder when he was in his twenties. When he takes the prescribed medications needed to treat his Bipolar I Disorder, the medications result in him being largely asymptomatic. However, one of the common symptoms of Bipolar I Disorder is that patients sometimes fail to follow their prescribed medication regimen.  Mr. Coster, for example, has ceased taking his medication from time to time, leading to the occurrence of symptoms, although in each instance in which this has occurred, and he required mental health interventions, Mr. Coster has been hospitalized or otherwise received mental health care, resumed his treatment, and his symptoms have abated. Mr. Coster has needed emergency medical treatment related to his Bipolar I Disorder approximately four times in the past 20 years for which his family has needed to call for help. None of these incidents involved violent or unlawful conduct by Mr. Coster.

**VI      DEFENDANTS' MISCONDUCT ON JANUARY 10, 2018.**

49.     On the morning of January 10, 2018, Mr. Coster was visiting his mother, Sharon Coster, for her birthday.

50.     At the time of this visit, Mr. Coster was suffering from delusions, and it was readily apparent to Ms. Coster that he had been off of his medication for some time.

51.     Accordingly, Ms. Coster convinced Mr. Coster to drive them both in her car to the Harford County Detention Center.  Her objective was to get Mr. Coster the help he needed.  In similar, prior situations, law enforcement professionals have assisted Ms. Coster in obtaining medical and psychiatric help for Mr. Coster's mental health disability, resulting in his receiving mental health treatment without incident.

13

52.     Upon arriving at the Detention Center at or around 8:00 AM, Mr. Coster and Ms. Coster parked in the driveway in front of the building, near a section of the lawn with a flagpole.

53.     Shortly thereafter, DFC Licato parked his Sheriff's Office cruiser in front of Ms. Coster's car.

54.     Ms. Coster exited her car and walked calmly over to the cruiser. She began a conversation with DFC Licato in the driveway in front of the Detention Center.  Ms. Coster explained to DFC Licato that her son was bipolar and off of his medication, and said that she thought he should be seen by medical professionals and wanted the Sheriff's Office to assist with connecting him with trained mental health professionals.  She said nothing to indicate that Mr. Coster was in any way threatening to himself or others.  She explicitly asked DFC Licato not to hurt Mr. Coster.  She was trying to provide DFC Licato with additional details, but he left without allowing her to do so.

55.     DFC Licato immediately approached the driver's side of Ms. Coster's car, where Mr. Coster was sitting with the door closed.  DFC Licato asked Mr. Coster for identification.  Mr. Coster complied, willingly handing his driver's license to DFC Licato through the open car window.  In response to questioning from DFC Licato, Mr. Coster told DFC Licato that the car belonged to his mother.

56.     At or around this time, DFC Licato was joined by DFC Majewski. In response to further questions, Mr. Coster said that no one could help him, and he began to repeat that "everything's going to be okay" and/or "everything's OK."

57.     Mr. Coster was not doing anything illegal and had not committed any crime. Despite these facts, DFC Licato reached into the car and unlocked the door from the inside.

**A.**     **First Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations: Unjustified Taser Discharges**

58.     After unlocking the car door, DFC Licato and DFC Majewski reached into the car and attempted to pull Mr. Coster out of the vehicle.  Mr. Coster resisted passively, shrinking away from the officers and seeking to avoid being pulled out of the vehicle.

59.     Within 15 seconds of when DFC Licato and DFC Majewski first tried to pull Mr. Coster from the car, DFC Majewski drew and discharged his Taser.  DFC Majewski did so notwithstanding that the Taser company itself advised in 2013 that law enforcement should avoid shocking someone "who is actually or perceived to be mentally ill."

60.     When DFC Majewski first fired his Taser, he did so in "probe mode," meaning that barbed metal darts with wires trailing behind them were shot from the Taser and into Mr. Coster, puncturing his skin and embedding into his flesh.  After the Taser barbs impaled Mr. Coster, DFC Majewski delivered four Taser cycles (lasting 5 seconds, 2 seconds, 3 seconds and 5 seconds) over the following 20 seconds.

61.     Three seconds later, DFC Majewski hit Mr. Coster with a Taser "stun drive."  During the "stun drive," DFC Majewski applied the Taser directly to Mr. Coster's leg, point blank, for 3 seconds, completing a circuit of electricity through Mr. Coster's body.  The only reason that DFC Majewski stopped using the Taser was that the Taser wires inadvertently began to shock DFC Licato.

62.     As explained in the Police Executive Research Forum & Community Oriented Policing Services, 2011 Electronic Control Weapon Guidelines 14 (2001), **"**[d]rive-stunning an individual causes great pain and carries a heightened risk of serious harm or injury when used on individuals with mental health disabilities or in crisis.**"**

63.     As the Fourth Circuit has explained, "[i]n drive-stun mode the taser functions to deliver a painful electric shock," as opposed to the use of probe mode, which delivers a cycle of electricity designed to cause electro-muscular disruption freeing the muscles and disabling the individual.  "In stun mode, the taser does not cause muscular disruption or incapacitation, but rather functions only as a pain compliance tool."  *Meyers v. Balt. Cty*, 713 F.3d 723, 728 n.3 (4th Cir. 2013) (internal quotations omitted).

64.     However, at the time that DFC Majewski used "stun mode"—a "pain compliance tool"—on Mr. Coster, there was no need for a pain compliance tool because Mr. Coster was not fighting, attempting to fight, or otherwise actively resisting.

65.     Further, the applicable Sheriff's Office policy states that a second Taser shock should only be used where necessary to control the individual; and only after giving the individual a reasonable opportunity to comply.  Notwithstanding this policy, DFS Majewski deployed the Taser repeatedly against Mr. Coster, in rapid succession, without giving him any chance to comply with his commands or DFC Licato's commands, and despite the fact that such force was unnecessary to control Mr. Coster, who was not fighting, attempting to fight, or otherwise actively resisting.

66.     DFC Majewski's failure to provide an adequate warning is further demonstrated by the fact DFC Licato had insufficient time to step back and avoid being shocked by the Taser wires. In fact, it was the shocks that were affecting DFC Licato that caused DFC Majewski to stop utilizing the Taser.

67.     Even before interacting with Mr. Coster, DFC Licato spoke with his mother, and learned that Mr. Coster was Bipolar and that his mother was requesting assistance to obtain medical help for Mr. Coster.  DFC Licato and DFC Majewski understood that Mr. Coster had come to the

16

Harford County Sheriff's Office voluntarily, with his mother, no less, and were able to observe that he was sitting peacefully in the car.  There was no exigency.

68.     There was ample time for the deputies to accommodate Mr. Coster's disability, treating his mental health crisis as a medical problem, not a criminal concern.

69.     For example, the deputies could have directed Ms. Coster and Mr. Coster to a hospital or called in qualified mental health practitioners. If that occurred, it is highly unlikely that the unfortunate events described in this Complaint would have followed.

70.     And if for some reason, the deputies were going to insist upon treating the situation as a police matter, they had another option:  The Harford County Sheriff's Office has a Crisis Intervention Team ("CIT") policy, HCSO Policy No. MAN6100, adopted October 15, 2013.

71.     According to the Policy, the CIT is "[a] team consisting of deputy sheriffs, correctional officers, and civilians who have received specialized training (Crisis Intervention Response Training)."

72.     Crisis Intervention Response Training, in turn, is defined as "[a] specialized course of instruction which provides training to law enforcement and correctional officers on responding to mental health crisis-related calls for service in the community and in the detention center. The Mental Health First Aid program serves as the foundation course for the CIT training."

73.     The CIT Policy explicitly states that CIT intervention should be considered unless an arrest is mandated.  It provides in relevant part:

> The primary goal of the CIT program is to have law enforcement, correctional, and civilian employees with specialized training available to assist individuals in mental health crisis. The primary method of accomplishing this goal is to identify the needs of the individual in crisis and make appropriate referrals to that individual. If it appears to be in the best interest of the community and the individual in crisis, ***CIT intervention should be considered as an alternative to arresting the individual*** (assuming law or policy does not mandate an arrest). Adhering to these

procedures should further the Agency's goal of reducing the number of mentally ill individuals entering the criminal justice system.

74.    In the event that Harford County Sheriff's deputies were unable to accommodate Mr. Coster's mental illness by referring him away from law enforcement, and toward appropriate mental health practitioners, then at a minimum, they should have reasonably accommodated Mr. Coster by using the CIT team.  Mr. Coster is the poster child for why the policy was developed— a person with a diagnosed mental health disability, in the midst of an acute mental health crisis, who voluntarily and peacefully came to the Sheriff's Office with his mother.

75.    DFC Licato and DFC Majewski, however, inexplicably failed to utilize their CIT to interact with Mr. Coster.  (In the alternative, if DFC Licato or DFC Majewski received CIT training prior to the incident, that training was inadequate and DFC Licato and DFC Majewski failed to appropriately utilize whatever training they received.)

76.    Moreover, once DFC Licato and DFC Majewski began to interact with Mr. Coster, they again failed to take steps to reasonably accommodate his mental health disability.  When Mr. Coster said that no one could help him and began repeating, largely to himself, that "everything's going to be OK," DFC Licato and DFC Majewski should have made appropriate accommodations, *e.g.*, ensured that personnel qualified to communicate with an individual in the midst of a mental health crisis were available to do so, slowing the pace of the interaction, referring the matter to medical providers—but they did not.

**B.    Second Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Kneeing Mr. Coster and Punching Him in the Back of the Head While He Was on the Asphalt Beside His Mother's Car.**

77.    Shortly after discharging the Taser, DFC Licato and DFC Majewski dragged Mr. Coster from his mother's car.

78. Once Mr. Coster was out of the car, the deputies pulled Mr. Coster's sweatshirt over his head, effectively blinding him, and then one of the deputies hit Mr. Coster with multiple punches and knee strikes, including an overhanded "hammer-fist" style punch to the back of Mr. Coster's head or neck.  At the same time, the other deputy held Mr. Coster.

79. Mr. Coster did not resist these blows, nor would he have been able to, given that he had been repeatedly Tased only moments before, was unable to see, and was being held down by one deputy while being hit by another.

**C.      Third Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Stripping and Punching Mr. Coster on the Detention Center Lawn.**

80. Once DFC Majewski and DFC Licato were done pummeling Mr. Coster while he was down, they moved him from the asphalt beside his mother car, over the curb and onto the Harford County Detention Center lawn.

81. In the process, they pulled Mr. Coster's sweatshirt further over his head, keeping him blinded and restricting his movement, and causing Mr. Coster's pants to fall to his ankles, leaving him exposed from the waist down at a public facility in the winter.

82. Mr. Coster, an extremely pious man, was highly embarrassed due to his involuntary exposure to numerous Sheriff's Office employees and his mother.

83. Mr. Coster did not fight, attempt to fight, or otherwise actively resist DFC Licato and DFC Majewski, and could not have done so because he was under their control; they were guiding his movements and administering additional punches.

**D.      Fourth Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  At Least Seven Individual Defendants Hold Down, Punch, and Knee Mr. Coster.**

84. Within ten to fifteen seconds from when DFC Majewski and DFC Licato moved Mr. Coster onto the Harford County Detention Center lawn, at least five additional Individual

Defendants including, but not limited to, Defendant Capasso, and on information and belief Defendants Jeric, Bliss, Norton, Robinson, Seman, and/or Kalambihis, joined DFC Licato and DFC Majewski in a dogpile on top of Mr. Coster, bringing the total number of Sheriff's Department employees bearing down on Mr. Coster to at least seven.

85.     The Individual Defendants, including, but not limited to, DFC Majewski, DFC Licato, and, on information and belief, Defendants Jeric, Bliss, Norton, Robinson, Seman, Kalambihis, and/or Warden Capasso, hit Mr. Coster and pressed their knees, elbows and bodies down into him.  Mr. Coster made no visible movements during this time, nor would he have been able to, given the number of officers on him.

86.     After battering Mr. Coster for about two minutes, most of the Individual Defendants walked away.  On information and belief, they did so because they had handcuffed Mr. Coster. But, notwithstanding that Mr. Coster was lying on the ground, inert and handcuffed, several Individual Defendants continued to kneel or stand on him.  In fact, at least one Individual Defendant who had walked away from Mr. Coster after Mr. Coster had been handcuffed returned and kneeled on Mr. Coster's back and neck some more.

87.     Once the Individual Defendants finally got off of Mr. Coster, they left him lying on the ground for another five to six minutes.  During this time, Mr. Coster did not move, other than occasionally writhing in pain.

88.     While Mr. Coster was lying on the ground, a group of Individual Defendants formed a circle around him, standing and talking with one another.  During that time, medical service providers approached the circle of Individual Defendants to examine Mr. Coster, but were turned away by the Individual Defendants, including Warden Capasso.

E.   **Fifth Utilization of Excessive Force and Unlawful Failure to Make Reasonable Accommodations:  Lifting Mr. Coster by His Cuffed Hands, Dislocating His Shoulder.**

89.   When Mr. Coster was in handcuffs and leg irons, two of the Individual Defendants brought Mr. Coster to his feet.  Mr. Coster then stood, surrounded by Individual Defendants, for about 15 minutes.

90.   At no time during this lengthy interval did Defendants attempt to provide Mr. Coster any reasonable accommodations for his mental health disability, such as calling in personnel qualified to communicate with Mr. Coster during his mental health episode or assisting Mr. Coster to receive appropriate medical treatment.

91.   Instead, after standing around for 15 minutes, two of the Individual Defendants began to frog march Mr. Coster toward the detention center. Because Mr. Coster was bent over double by his elbows, he was only able to walk for a few yards before he lost his footing.

92.   At this point, two of the Individual Defendants hoisted Mr. Coster off his feet and into the air by his wrists or elbows while his hands were handcuffed behind his back. This harsh stress position was injurious to Mr. Coster's shoulder and caused him excessive pain.

93.   The Individual Defendants lifting Mr. Coster used so much force that Mr. Coster was literally flipped upside down, and the Individual Defendants carried him into the Harford County Detention Center with his feet in the air and his head just above the pavement. On information and belief, this is when the Individual Defendants dislocated Mr. Coster's shoulder.

94.   Lifting a prisoner who has been restrained in handcuffs and leg irons by his hands is wholly unnecessary and certain to cause torturous, excruciating pain.

95.   On information and belief, the Individual Defendants who lifted Mr. Coster by his wrists when his hands were cuffed behind his back include but are not limited to Mark Jeric, Bliss, Matthew Norton, Robinson, D. Seman, Stavros Kalambihis, and/or Warden Capasso.

### F.   Mr. Coster's Injuries

96.   As a direct result of the excessive force the Sheriff's Office and the Individual Defendants inflicted on Mr. Coster, his left shoulder was dislocated, he had extensive lacerations and bruising, including a bruised and/or fractured rib, his clothes were bloodied, and his glasses were broken.  A medical assessment of Mr. Coster on March 9, 2018—approximately two months after the incident—indicated that he still had ankle abrasions and bruises on his body. Photos taken from the Detention Center incident show that Mr. Coster's face was bruised and bloodied, and that he was bleeding from his head and ankle.

97.   Ms. Coster was forced to watch helplessly as the events described above occurred. The stress of the event caused Ms. Coster to cry herself to sleep at night.  Not long after the incident, she began to suffer from heart failure.[8]

98.   When Ms. Coster convinced Mr. Coster to drive to the Detention Center that morning, she was looking for help and trusted the Sheriff's Office to provide it. In similar, prior situations, law enforcement professionals have assisted Ms. Coster in obtaining necessary mental health treatment for Mr. Coster without incident.  Instead, Mr. Coster was assaulted because the Individual Defendants wrongly perceived him as a threat due to his mental health disability, and injured him to the point that he required hospitalization.

## VII    MR. COSTER'S CONFINEMENT AT THE HARFORD DETENTION CENTER

99.   Mr. Coster was confined in the Harford County Detention Center immediately after the events described above.  At the time of his incarceration on January 10, 2018, the Harford County Detention Center and the Harford County Sheriff's Office were aware that Mr. Coster had

---

[8] While it is not possible to know if this is connected to the incident, WebMD explains, "[i]ntense grief, acute anger, and sudden fear can have direct -- sometimes fatal -- effects on the human heart."

been diagnosed as Bipolar, that he was suffering from an acute mental health crisis, and that he was injured, including a shoulder that was dislocated and/or otherwise required immediate medical attention, from his encounter with the Sheriff's Office deputies.

100.   It was apparent to the Harford County Detention Center and the Harford County Sheriff's Office that Mr. Coster's ability to communicate and engage in decision making were being adversely affected by his mental health.

101.   The Harford County Detention Center and the Harford County Sheriff's Office should have reasonably accommodated Mr. Coster's disability by ensuring that there were professionals who were qualified to communicate with him, but they failed to do so.  As a result, the Harford County Detention Center and the Harford County Sheriff's Office left Mr. Coster to suffer in intense and unnecessary pain, rather than receive prompt medical treatment for his injuries.

102.   Sheriff's Office employees, including Warden Michael Capasso and the other Individual Defendants, especially those who had lifted Mr. Coster off the ground by his wrists when he was handcuffed and carried him into the Harford County Detention Center upside down, had actual knowledge that Mr. Coster's shoulder was injured, that he was in excruciating pain, and that he was in need of immediate medical attention, but were deliberately indifferent to his pain, suffering, and medical needs.

## VIII   SHERIFF'S OFFICE MISCONDUCT ON JANUARY 11, 2018

103.   It was only on the following day that the Sheriff's Office transported Mr. Coster to Upper Chesapeake Medical Center for treatment of the injuries caused by the Sheriff's Office.

104.   Defendants Sergeant Meador, DFC Joe DiBartolo and Corporal Goins assisted in the transport detail and provided security while Mr. Coster was being treated.

741503335.2 7-MAY-21 19:12

105.    The Harford County Sheriff's Office has a policy for the Security of Prisoners in Hospitals and EMS settings.  The policy provides for prisoners to be restrained during hospital admissions and treatment, setting forth in relevant part:

VII.    SECURITY/RESTRAINTS    DURING    ROUTINE    TREATMENT    AND ADMISSIONS
A. Leg irons and handcuffs are the custodial restraining devices used to restrain the prisoner unless the attending physician should request other devices which will not interfere with the patient's care. Flex cuffs are required in the critical care units, operating rooms and other specialty areas where the use of metal restraints conflict with the provision of medical care.

B. All prisoners, regardless of security status, shall be secured to the bed, wheelchair, etc., unless prohibited in writing by the physician. As a minimum, one arm and one leg shall be secured to the bed at all times unless restraints conflict with the provision of medical care.

VIII. SECURITY/RESTRAINTS DURING MEDICAL PROCEDURES

A. Prisoners in pre-op are to be restrained in a manner consistent with the operating room procedures using flex cuffs. Flex cuffs may be applied in a fashion that do not interfere with the operative procedure to be performed (one leg to the gurney, both legs together, one arm to the gurney, both arms together or whatever works to immobilize or sufficiently restrict movement) and will be applied prior to the removal of metal restraints.

106.    Consistent with the foregoing policy, during the time that Mr. Coster was in the hospital, his only limb that was not shackled to the bed was his left arm, the arm attached to his dislocated shoulder.

107.    Hospital staff attached a weighted medical device to Mr. Coster's dislocated shoulder in an attempt to reset it. The procedure required Mr. Coster to change positions on his hospital bed multiple times. Mr. Coster was cooperative.

108.    Eventually, hospital staff instructed Mr. Coster to change positions so that he was lying on his stomach while still attached to the weighted medical device. As Mr. Coster changed positions and hospital staff began tightening the device, Mr. Coster became extremely agitated

24

from the pain of the procedure, exacerbated by the fact that he was still in the midst of an acute mental health crisis. He yelled and tried to pull away from the hospital staff.

109.   Mr. Coster did not intentionally behave violently toward anyone in the room.  He behaved like a person in pain and during a mental health crisis.  Sgt. Meador says that Mr. Coster kicked him—if so, it was inadvertent, and the prosecutor declined to prosecute Mr. Coster for charges that were filed in connection with the alleged incident.[9]  A photograph of Sergeant Meador's face taken shortly after he claims Mr. Coster allegedly kicked him does not show any signs of injury, and Sergeant Meador told a nurse that he was fine.

110.   Mr. Coster, however, was not.  Jumping to the wrong conclusions because of Mr. Coster's mental health status, Defendants Meador, Goins and DiBartolo rapidly escalated to an unnecessary and unconscionable level of violence.

111.   One of the Individual Defendants present, on information and belief, instructed the hospital staff to leave the room. Once hospital staff left, Corporal Goins began striking Mr. Coster in the face while the other two other Individual Defendants pinned him to the bed.  By the end of the incident, Mr. Coster's face and chest were bloody, and his clothing had to be cut away and discarded.  The Sheriff's Office chose not to photograph Mr. Coster in the wake of this incident.

112.   On information and belief, no member of the CIT was assigned as part of Mr. Coster's security detail at the hospital,  despite the prior day's disastrous events at the Detention Center.  The Harford County Sheriff's Office should have assigned a CIT member to the detail. (In the alternative, if the Sheriff's Office employees present had CIT training, they were inadequately trained and/or failed to utilize that training.)

---

[9] Court records indicate that the charges stemming from the events of January 11, 2018 were resolved by stet docket and *nolle prosequi*.

25

113.    Once again, the Sheriff's Office employees treated Mr. Coster as a criminal and failed to accommodate his obvious and known disabilities by giving him calm, space, time and having a mental health peer or professional approach him.  Instead, multiple armed enforcers confronted him with similar methods and results to what the Sheriff's Office had done the day before.

114.    For the second time in two days, the Sheriff's Office acted based on fear, ignorance and pernicious bias against the mentally ill, grossly misjudged how best to handle the situation, and needlessly inflicted serious physical and mental trauma on Mr. Coster.

### COUNT I:  VIOLATION OF TITLE II
### OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 *ET SEQ.* –
### FAILURE TO PROVIDE REASONABLE ACCOMODATIONS
**Against Defendant State of Maryland, Harford County Sheriff's Office, and Harford County Detention Center**

115.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

116.    Title II of the Americans with Disabilities Act ("ADA") and its implementing regulations provide that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

117.    Title II further provides that a public entity shall make reasonable modifications to its policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

118.    Title II further provides that a public entity shall, among other things, ensure that communications with "applicants, participants, members of the public, and companions with disabilities" are as effective as communications with others. 28 C.F.R. § 35.160(a).

741503335.2 7-MAY-21 19:12

119.     At all times relevant to this action, Mr. Coster had a mental health disability, Bipolar Disorder, which substantially limits the major life activities of communicating, concentrating, thinking, and learning; thus, Mr. Coster was and is a qualified individual with a disability within the meaning of the ADA.

120.     As Mr. Coster was physically present in Harford County, he was otherwise qualified to participate in or benefit from the programs or services offered by the Harford County Sheriff's Office and/or Harford County Detention Center.

121.     Defendant State of Maryland was, at all times relevant to this action, the public entity obligated to (i) ensure that Mr. Coster, as a qualified individual with a disability, was afforded an opportunity to participate in the programs, services, and activities offered by the Harford County Sheriff's Office and Harford County Detention Center without being discriminated against and (ii) make reasonable modifications in policies, practices, or procedures when necessary to avoid disability-related discrimination.

122.     At all times relevant to this action, DFC Licato and DFC Majewski, had notice that Mr. Coster had a mental health disability.

123.     Despite being aware of Mr. Coster's mental health disability from the very beginning of their interaction with him, Deputies Licato and Majewski failed to provide any accommodations during their initial interaction with and eventual arrest of Mr. Coster. Among other things, Deputies Licato and Majewski failed to provide reasonable accommodations such as (i) requesting or directing Mr. Coster to mental health resources without resorting to the use of public law enforcement, (ii) providing time and space to calm the situation and communicate clearly and in a non-threatening manner or (iii) requesting and properly utilizing crisis intervention trained officers to deescalate the situation.

741503335.2 7-MAY-21 19:12

124.    Instead of providing reasonable accommodations, including the accommodations described above, DFC Licato and DFC Majewski relied upon stereotypes and presumptions related to Mr. Coster's being a person with a mental illness to launch into illegal conduct and unreasonable use of force against Mr. Coster with the assistance of other officers and employees.

125.    The Individual Defendants further failed to provide reasonable modifications in connection with Mr. Coster's need for medical treatment following his arrest, including, for example, utilizing properly-trained and experienced personnel to communicate with Mr. Coster regarding his need for medical treatment and any potential concerns.

126.    Defendants Meador, Goins, and DiBartolo had notice of Mr. Coster's disability and nonetheless failed to provide reasonable accommodations in connection with Mr. Coster's transport to Upper Chesapeake Medical Center for treatment of injuries sustained during his arrest, including failing to utilize properly-trained and experienced personnel to effectively communicate with Mr. Coster.

127.    Defendants Meador, Goins, and DiBartolo further failed to provide reasonable modifications to their own execution of Defendants' policy for Security of Prisoners in Hospitals and EMS Settings or their own execution of security procedures and practices to avoid using force.

128.    Defendants Majewski, Licato, Meador, Goins, and DiBartolo knew or should have known that a failure to provide reasonable modifications during their transportation of Mr. Coster in their initial encounter, eventual arrest, transportation to the hospital, and their supervision of Mr. Coster at the hospital was substantially likely to harm a federally-protected right of Mr. Coster under the ADA. Despite this likelihood, Defendants failed to provide reasonable modifications.

129.    Through the acts and omissions described above and alleged in paragraphs 49-114, Defendants Majewski, Licato, Meador, Goins, and DiBartolo acted with discriminatory animus

towards Mr. Coster because of his disability and deprived him of equally effective communication to that which is provided to non-disabled individuals or, at the very least, deliberate indifference towards Mr. Coster's federally-protected rights.

130.    As a result of these acts or omissions, Defendants Majewski, Licato, Meador, Goins, and DiBartolo caused Mr. Coster to be treated as a second-class citizen due to his disability, arrested, deprived of equally effective communication as that of a non-disabled individual, sustain significant injuries, and to suffer avoidable embarrassment, stress, and exacerbation of his Bipolar I Disorder.

131.    Defendants  Majewski, Licato, Meador, Goins, and DiBartolo acted under color of law and on behalf of the Harford County Sheriff's Office and/or Harford County Detention Center, which approved and/or condoned their actions. As such, any liability on the part of the Individual Defendants and other officers and employees is imputed to Defendant State of Maryland.

**COUNT II:  VIOLATION OF TITLE II**
**OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 *ET SEQ.* –**
**FAILURE TO TRAIN**
**Against Defendant State of Maryland, Harford County Sheriff's Office, and Harford**
**County Detention Center**

132.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

133.    Defendant State of Maryland and the Harford County Sheriff's Office have a duty to properly train officers and employees about disability and their duty to comply with the ADA, including how to interact with individuals with disabilities in the course of an investigation or arrest.

134.    Title II provides that a public entity shall administer services, programs, and activities in the most integrated setting consistent with an individual with a disability's needs. 28 C.F.R. § 35.130(d).

29

135.    Title II further provides that a public entity may not utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3).

136.    The failure by Defendant State of Maryland through Harford County Sheriff's Office and Harford County Detention Center to properly train Defendants Majewski, Licato, Meador, Goins, and DiBartolo about how to interact with individuals with disabilities is a violation of Title II of the ADA.

137.    As a result of the failure by Defendants State of Maryland and Harford County Sheriff's Office to train its officers and employees on how to interact with individuals with disabilities, Defendant State of Maryland failed to ensure that Mr. Coster's need for mental health treatment was addressed in the most integrated setting consistent with his needs, diversion to a community hospital as Ms. Coster had sought or contacting mobile crisis services for intervention and referrals. Instead, Defendant State of Maryland unnecessarily subjected Mr. Coster to law enforcement and the criminal justice system rather than address his mental health needs.

138.    As a result of the failure by Defendant State of Maryland through the Harford County Sheriff's Office and Harford County Detention Center to train its officers and employees on how to interact with individuals with disabilities, Defendants Licato, Majewksi, Meador, Goins, and DiBartolo caused Mr. Coster to be treated as a second-class citizen due to his disability, arrested, deprived of equally effective communication as for a non-disabled individual, sustain significant injuries, be confined in a restrictive, segregated setting, and to suffer avoidable embarrassment, stress, and exacerbation of his Bipolar I Disorder.

741503335.2 7-MAY-21 19:12

139.     By failing to train its officers or employees on how to interact with individuals with disabilities and by failing to develop, maintain, and enforce policies that serve to ensure individuals experiencing mental health crises are not subjected to the criminal justice system without cause, Defendant State of Maryland through Harford County Sheriff's Office and Harford County Detention Center has used criteria or methods of administration that serve to subject individuals with disability to discrimination while simultaneously defeating or substantially impairing the purpose of both the Sheriff's Office's law enforcement and crisis intervention objectives.

**COUNT III: VIOLATIONS OF SECTION 504**
**OF THE REHABILITATION ACT OF 1973 – 29 U.S.C. § 794 *ET SEQ.***
**Against Defendant State of Maryland, Harford County Sheriff's Office, and Harford County Detention Center**

140.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

141.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

142.     On information and belief, the Harford County Sheriff's Office and/or Harford County Detention Center receives federal financial assistance and is thus subject to the requirements of Section 504.

143.     On information and belief, as a condition of receipt of federal funds, Harford County Sheriff's Office and/or Harford County Detention Center are required to certify that they are in compliance with federal civil rights statutes, including Section 504's requirement that governmental entities not discriminate against individuals with disabilities.

144.    Were it not for the Individual Defendants' preconceived and erroneous notions about mentally ill individuals, they would never have perceived Mr. Coster—a 145 pound man sitting in his mother's car and not behaving violently toward anyone, and who they knew had a mental health disability—as a threat, let alone tased him within seconds of his replies that "Everything will be OK," followed up with punches and knee strikes, placed their knees on his back and neck, and lifted him by his wrists when his hands were cuffed behind his back.

145.    Through the acts and omissions described above and alleged in paragraphs 49-114, Defendants Meador, Goins, DiBartolo, and the Individual Defendants discriminated against Mr. Coster solely based on his mental health disability.  Were it not for Defendants Meador, Goins, and DiBartolo's preconceived and erroneous notions about mentally ill individuals, they would never would have perceived Mr. Coster—a 145 pound man who was injured, shackled to a hospital bed, and not behaving violently toward anyone, but who they knew was bipolar—as a threat, let alone would two of the officers have held him while a third hit him in the face.

146.    As a result of these acts or omissions, Defendants Licato, Majewski Meador, Goins, and DiBartolo caused Mr. Coster to be treated as a second-class citizen due to his disability, arrested, deprived of equally effective communication as for a non-disabled individual, sustain significant injuries, and to suffer avoidable embarrassment, stress, and exacerbation of his Bipolar I Disorder.

147.    The Individual Defendants acted under color of law and on behalf of the Harford County Sheriff's Office and/or Harford County Detention Center, which approved and/or condoned their actions. As such, any liability on the part of the Individual Defendants is imputed to Defendant State of Maryland.

741503335.2 7-MAY-21 19:12

## COUNT IV:  VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEIZURE
### Against DFC Majewski, DFC Licato, and the other Individual Defendants

148.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

149.    Plaintiff asserts this count under 42 U.S.C. § 1983 against the Individual Defendants.

150.    DFC Majewski, DFC Licato, and the other Individual Defendants were, at all times relevant to the actions alleged herein, officers of the Harford County Sheriff's Office and thus persons acting under color of state law within the meaning of Section 1983.

151.    The Fourth Amendment provides that people have the right to be free from unreasonable seizures of their persons without probable cause. U.S. Const. amend. IV.

152.    When DFC Majewski and DFC Licato continued to interact with Mr. Coster after he assured the Defendants that "everything is okay" and proceeded to forcibly remove Mr. Coster from his vehicle, DFC Majewski and DFC Licato seized Mr. Coster under color of law.

153.    At no time did DFC Majewski or DFC Licato have a warrant or probable cause to arrest or detain Mr. Coster. In fact, they had no reason to believe anything other than what Ms. Coster told them—that Mr. Coster was suffering from a mental health emergency.

154.    Additionally, DFC Majewski and DFC Licato did not have reasonable suspicion to support any seizure of Mr. Coster for the purposes of further investigation.

155.    Mr. Coster had a clear and well-established right not to be seized without cause or justification such that a reasonable officer would understand that such a seizure would violate Mr. Coster's rights under the Fourth Amendment.

156.    DFC Majewski and DFC Licato's seizure of Mr. Coster occurred under color of law and constituted callous indifference to and reckless disregard of Mr. Coster's rights under the Fourth Amendment.

## COUNT V:  VIOLATION OF THE FOURTH AMENDMENT – EXCESSIVE FORCE
**Against Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants**

157.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

158.    Plaintiff asserts this count under 42 U.S.C. § 1983 against Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants.

159.    Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants were, at all times relevant to the actions alleged herein, officers of the Harford County Sheriff's Office and thus persons acting under color of state law within the meaning of Section 1983.

160.    The Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants engaged in conduct, described above and alleged in paragraphs 49-114, that constituted excessive force, far beyond that which a reasonable officer would have used in the initial detention and eventual arrest of Mr. Coster.

161.    The Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants did not have a reasonable basis to believe that Mr. Coster had committed a crime, let alone a crime requiring the use of substantial force to effect Mr. Coster's detention and eventual arrest.

162.    Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants did not have a reasonable basis to believe that

741503335.2 7-MAY-21 19:12

Mr. Coster was armed or that Mr. Coster posed an immediate threat to the safety of law enforcement, corrections staff, or to any other person present at the time.

163.     Nonetheless, Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants used an objectively unreasonable level of force in Mr. Coster's initial detention and eventual arrest to such an extent that Mr. Coster was injured as set forth herein.

164.     Under the circumstances, Mr. Coster had a clear and well-established right not to be tased, beaten, stripped, suspended by his elbows, and otherwise subjected to excessive force by officers such that a reasonable officer would understand that such actions would violate Mr. Coster's rights under the Fourth Amendment.

165.     Defendants Licato, Majewski, Jeric, Bliss, Norton, Robinson, Seman, Capasso, Kalambihis, and the other Individual Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Mr. Coster's rights under the Fourth Amendment.

## COUNT VI:  VIOLATION OF THE FOURTEENTH AMENDMENT – EXCESSIVE FORCE
### Against Defendants Meador, Goins, and DiBartolo

166.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

167.     Plaintiff asserts this count under 42 U.S.C. § 1983 against Defendants Meador, Goins, and DiBartolo.

168.     Defendants Meador, Goins, and DiBartolo were, at all times relevant to the actions alleged herein, officers of the Harford County Sheriff's Office and thus persons acting under color of state law within the meaning of Section 1983.

169.    Defendants Meador, Goins, and DiBartolo engaged in conduct, described above and alleged in paragraphs 103-114, that constituted excessive force, far beyond that which a reasonable officer would have used to detain Mr. Coster for the purposes of medical treatment or for any other purpose, particularly given that Mr. Coster was substantially restrained in connection with an ongoing medical procedure.

170.    Defendants Meador, Goins, and DiBartolo did not have a reasonable basis to believe that Mr. Coster posed an immediate threat to the safety of Defendants Meador, Goins, and DiBartolo, medical staff, or to any other person present at the time that they used excessive force on Mr. Coster, particularly given that Mr. Coster was substantially restrained in connection with an ongoing medical procedure.

171.    Nonetheless, Defendants Meador, Goins, and DiBartolo used an objectively unreasonable level of force  on Mr. Coster to such an extent that Mr. Coster was unnecessarily injured as set forth herein.

172.    Under the circumstances, Mr. Coster had a clear and well-established right not to be subjected to excessive force by officers such that a reasonable officer would understand that such actions would violate Mr. Coster's rights under the Fourteenth Amendment.

173.    Defendants Meador, Goins, and DiBartolo engaged in this conduct under color of law and such conduct constituted callous indifference to and reckless disregard of Mr. Coster's rights under the Fourteenth Amendment.

### COUNT VII:  FALSE ARREST – MARYLAND COMMON LAW
**Against DFC Majewski, DFC Licato, Warden Capasso and the other Individual Defendants**

174.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

175.    By effecting an initial detention of Mr. Coster without cause DFC Majewski, DFC Licato, Warden Capasso and the other Individual Defendants, as described above and alleged in paragraphs 49-102, deprived Mr. Coster of his liberty without his consent and without legal justification for such detention.

176.    As a direct, proximate, and consequential result of the conduct by the Individual Defendants, as described above, Mr. Coster sustained significant injuries as set forth herein.

<b>COUNT VIII:  BATTERY – MARYLAND COMMON LAW</b>
<b>Against DFC Majewski, DFC Licato, Warden Capasso and the other Individual Defendants.</b>

177.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

178.    The conduct of DFC Majewski, DFC Licato, Warden Capasso and the other Individual Defendants, described above and alleged in paragraphs 49-102, including but not limited to tasing, beating, stripping Mr. Coster, and lifting him by his wrists while his hands were handcuffed behind his back, constituted an intentional, unwelcome, and unprivileged touching of Mr. Coster and was undertaken deliberately and with actual malice.

179.    As a direct, proximate, and consequential result of the conduct by

180.    DFC Majewski, DFC Licato, Warden Capasso and the other Individual Defendants, as described above, Mr. Coster sustained significant injuries as set forth herein.

<b>COUNT IX:  BATTERY – MARYLAND COMMON LAW</b>
<b>Against Defendants Meador, Goins, and DiBartolo</b>

181.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

182.    The conduct of Defendants Meador, Goins, and DiBartolo, described above and alleged in paragraphs 103-114, including but not limited to: (1) grabbing, holding, pinning or

controlling Mr. Coster's body; and (2) punching or striking Mr. Coster in the face, constituted an intentional, unwelcome, and unprivileged touching of Mr. Coster and was undertaken deliberately and with actual malice.

183.    As a direct, proximate, and consequential result of the conduct of Defendants Meador, Goins, and DiBartolo, as described above, Mr. Coster sustained significant injuries as set forth herein.

## COUNT X:  VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS – BYSTANDER LIABILITY
### Against the Individual Defendants

184.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

185.    As set forth herein, each Individual Defendant is individually liable to Mr. Coster for his unconstitutional conduct. However, each Defendant is also liable to Mr. Coster under a theory of bystander liability. A law officer has a "duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) (*quoting Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002)).

186.    Bystander liability attaches where a law enforcement officer knows that a fellow officer was violating an individual's constitutional rights and the officer had a reasonable opportunity to prevent the harm but chose not to act. *Id.*

187.    Each of the Individual Defendants witnessed first-hand other Individual Defendants assault Mr. Coster and violate his constitutional rights, as described in paragraphs 49-114.

188.    Defendant Licato watched Defendant Majewski excessively taser Mr. Coster, and did not attempt to intervene to prevent that from occurring.

189.     Certain of the Individual Defendants watched other of the Individual Defendants repeatedly striking Mr. Coster with their fists and knees even after Mr. Coster was lying inert and restrained on the ground outside the Harford County Detention Center. None of those Defendants attempted to intervene despite being present at the scene.

190.     Certain of the Individual Defendants watched as two of the Individual Defendants dislocated Mr. Coster's shoulder by lifting him by his hands while he was handcuffed. None of those Defendants attempted to intervene despite being present at the scene and having ample opportunity to intervene and to prevent violation of Mr. Coster's constitutional rights.

## **RELIEF REQUESTED**

191.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and grant the following:

192.     Declare the Defendant State of Maryland violated Mr. Coster's rights under the ADA and Section 504 of the Rehabilitation Act to be free from disability discrimination;

193.     Declare that the Individual Defendants violated Mr. Coster's rights under the Fourth Amendment to be free from the use of excessive force against his person;

194.     Declare that the Individual Defendants violated Mr. Coster's rights under the Fourth Amendment to be free from unreasonable seizure;

195.     Declare that Defendants Harford County Sheriff's Office and Harford County Detention Center violated Mr. Coster's rights under the Fourteenth Amendment to be free from unreasonable conditions of confinement;

196.     Declare that the Individual Defendants violated Mr. Coster's rights under Maryland law to be free from battery;

197.     Declare that Defendants Licato and Majewski violated Mr. Coster's rights under Maryland law to be free from false arrest;

198.    Enjoin the State of Maryland, its employees, agents, and any and all persons acting on the State of Maryland's behalf from further violations of the ADA, Section 504 of the Rehabilitation Act, and the Fourth Amendment;

199.    Enjoin the Defendants from using the techniques of law enforcement applicable to persons suspected of wrongdoing when interacting with persons with mental health disabilities unless those persons are reasonably suspected of criminal wrongdoing and exhibiting visible indicia of being a risk to themselves or others, and directing Defendants instead to utilize non-law enforcement mechanisms, such as mobile crisis response, referrals to mental health practitioners, and peer-to-peer support, in such situations.

200.    Award to Mr. Coster his reasonable actual damages as compensation for injuries sustained as a result of (i) Defendant State of Maryland's violations of Title II of the ADA and Section 504 of the Rehabilitation Act, and (ii) all Individual Defendants' violations of Mr. Coster's rights under the Fourth Amendment, Fourteenth Amendment and Maryland law;

201.     Award to Mr. Coster his reasonable damages as compensation for his pain and suffering as a result of (i) Defendant State of Maryland's violations of Title II of the ADA and Section 504 of the Rehabilitation Act, and (ii) all Individual Defendants' violations of Mr. Coster's rights under the Fourth Amendment, Fourteenth Amendment and Maryland law;

202.    Award Mr. Coster punitive damages for the Individual Defendants' callous indifference and reckless disregard of Mr. Coster's rights under the Fourth Amendment and Fourteenth Amendment and the Individual Defendants' willful and outrageous conduct under Maryland Law;

203.    Award Mr. Coster his costs and reasonable attorneys' fees; and

204.    Grant such other and further relief as this Court deems just and proper.

40

41

## **JURY DEMAND**

205.    Plaintiff requests a trial by jury on any and all issues raised by this Complaint which are triable by right of a jury.


May 7, 2021                                         Respectfully submitted,


  /s/       Luciene M. Parsley
Luciene M. Parsley (Fed. Bar #27089)
Disability Rights Maryland
1500 Union Ave., Suite 2000
Baltimore, Maryland  21211
Phone:  (410) 727-6352 x2494
Facsimile: (410) 727-6389
LucieneP@DisabilityRightsMD.org

WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
  /s/_____Jonathan M. Smith
Jonathan M. Smith*
Jacqueline Kutnik-Bauder*
Margaret Hart*
Tristin Brown (MD Bar 21321)
700 14th Street NW, Suite 400
Washington, D.C. 20005
Tel: 202-319-1000
Fax: 202-319-1010
Email: jonathan_smith@washlaw.org
jacqueline_kutnik-bauder@washlaw.org
margaret_hart@washlaw.org
tristin_brown@washlaw.org
*Pro hac vice application pending

  /s/
Reginald Goeke
Federal Bar Number 13527
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3312
RGoeke@mayerbrown.com

Alex Lakatos
(*pro hac vice* admission)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3312
ALakatos@mayerbrown.com

Brad Resnikoff
(*pro hac vice* admission application to be filed)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3110
BResnikoff@mayerbrown.com

Kelly Truesdale
(*pro hac vice* admission)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3294
KTruesdale@mayerbrown.com

Daniel Pearson
(*pro hac vice* admission)
Mayer Brown LLP
1999 K St. NW
Washington DC 20006-1101
(202) 263-3764
DPearson@mayerbrown.com

*Counsel for Plaintiff*